**Paul LAXALT, Plaintiff,**

**v.**

**C.K. McCLATCHY; McClatchy Newspapers, a corporation; The Sacramento Bee, a newspaper; Frank McCulloch; Michael Kidder; Dennis Walsh; Art Nauman; the Fresno Bee, a newspaper; George Gruner; Don Slinkard; the Modesto Bee, a newspaper; Sanders LaMont; Ray Nish; Doe Corporations I through XX; Doe Partnerships I through XX; Doe Associations I through XX; and Does I through XX, Defendants.**

**No. CV–R–84–407–ECR.**

United States District Court, D. Nevada.

Nov. 18, 1985.

Richard L. Davenport, Reno, Nev., James E. Beasley, Philadelphia, Pa., for plaintiff.

Kathleen V. Fisher, Ray Larroca, James L. Brosnahan, Linda E. Shostak, San Francisco, Cal., for all defendants except Walsh.

Thomas E. Kotoske, Palo Alto, Cal., for defendant Walsh.

## ORDER

EDWARD C. REED, Jr., District Judge.

On September 21, 1984, the plaintiff, a United States Senator from Nevada, filed a complaint in the First Judicial District Court of the State of Nevada against the named defendants. The named defendants are McClatchy Newspapers, C.K. McClatchy, the president, editor, and director of defendant McClatchy Newspapers, and three newspapers, namely The Sacramento Bee, The Modesto Bee, and The Fresno Bee, which are not separate legal entities but are owned entirely by McClatchy. The other individual defendants include Frank McCulloch, executive editor of McClatchy, Denny Walsh, staff reporter at McClatchy, Michael Kidder, managing editor at McClatchy, and Art Nauman, ombudsman of The Sacramento Bee. Also named in the complaint were George Gruner and Don Slinkard, executive director and managing editor, respectively, of The Fresno Bee; and Sanders LaMont and Ray Nish, executive editor and managing editor, respectively, of The Modesto Bee. The case was removed to this court pursuant to defendants' petition for removal filed in this court on October 3, 1984.

The lawsuit concerns a series of articles written by defendant Walsh and published in all three newspapers on November 1, 1983, entitled "Agents Say Casino 'Skimmed' During Senator Laxalt's Ownership." Another article published the same day in all three newspapers written by defendant Nauman was entitled "Laxalt Donors Included Gaming Figures With Mob Ties." A third article was also authored by Nauman, entitled "Laxalt Buried" and was published on November 6, 1983, in the Sacramento Bee. All of the articles purport to establish links between Senator Laxalt and organized crime.

Plaintiff's complaint is in three counts. The first is for libel and defamation, the second for an alleged conspiracy among all defendants to commit the libel, and the third for intentional infliction of emotional distress. Defendants have moved to dismiss the defendants Sacramento Bee, Fresno Bee, and the Modesto Bee on the grounds that these newspapers have no legal existence separate from McClatchy Newspapers. In addition, the defense seeks to dismiss the employees of the Fresno and Modesto Bees on the grounds that there is no personal jurisdiction over them in this forum. Finally, defendants have moved this Court to dismiss plaintiff's cause of action for civil conspiracy, on the grounds that it fails to state a claim for which relief can be granted.

After the plaintiff filed suit, and after the defendants had removed to this court, the defendants counterclaimed for alleged violations of their first amendment rights and for abuse of process. Plaintiff filed a motion to dismiss these counterclaims, alleging that they failed to state a claim for which relief could be granted.

This case comes to this court by way of the United States Magistrate, who has heard oral arguments on the various motions, and has tendered her report and recommendation to this Court. The report recommends the following:

1. That the defendants' motion to dismiss be granted and denied in the following respects:

A. The motion to dismiss The Sacramento Bee, The Fresno Bee, and The Modesto Bee pursuant to Rule 17(b) should be *granted.*

B. George Gruner, Don Slinkard, Sanders LaMont, and Ray Nish's Motion to Dismiss for lack of personal jurisdiction should be *denied, without prejudice* to refiling of the motion after the close of discovery pursuant to a schedule ordered later by the Court.

C. The motion to dismiss plaintiff's cause of action for civil conspiracy should be *granted.*

2. That the plaintiff's motion to dismiss the defendants' counterclaims for failure to state a claim be *granted.*

Having reviewed the Magistrate's report according to the proper standards, this Court finds it to be an accurate statement of the law, and hereby affirms and adopts it.

## DEFENDANTS' MOTION TO DISMISS

■ Defendants have moved this Court, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss various parts of the complaint. Such a motion may not be granted unless it appears to a certainty that the claimant would be entitled to no relief under any state of facts that could be proved. On a motion to dismiss the complaint, the Court presumes that the facts alleged by the claimant are true. *Halet v. Wend Inv. Col.,* 672 F.2d 1305, 1309 (9th Cir.1982). It is the material facts pleaded, however, and not the characterizations or conclusions drawn from them which are entitled to a presumption of truth. *See Ivey v. Board of Regents,* 673 F.2d 266 (9th Cir.1982); *Kennedy v. H & M Landing, Inc.,* 529 F.2d 987 (9th Cir.1976). The essential elements of the claim asserted must be supplied by the factual pleadings, or the claim will fall to the motion to dismiss. *Rae v. Union Bank,* 725 F.2d 478, 480 (9th Cir.1984); *Admiralty Fund v. City National Bank,* 677 F.2d 1315, 1316–17 (9th Cir.1982).

Defendants' motion to dismiss is in three separate parts. Initially, they move to dismiss The Sacramento Bee, The Modesto Bee, and The Fresno Bee from the action entirely, in that the newspapers lack legal standing to sue or be sued and are not the real parties in interest in this suit. As the papers are but wholly owned subsidiaries of McClatchy Newspapers, and because McClatchy has already been named as a defendant, defendants argue, the individual newspapers should be dismissed under Rule 17(b).

There is no doubt that the three newspapers are wholly owned subsidiaries of McClatchy. The plaintiff has admitted as much in paragraph 3 of his complaint. Plaintiff contends, however, that the dependent nature of the newspapers is not relevant, in that the Sacramento Bee has been allowed to sue in its own stead on various occasions. *See McClatchy Newspapers d/b/a The Sacramento Bee v. Central Valley Typographical Union No. 46,* 686 F.2d 731 (9th Cir.), *cert. denied* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982); *The Sacramento Bee, published by McClatchy Newspapers v. United States District Court,* 656 F.2d 477 (9th Cir.), *cert. denied* 456 U.S. 983, 102 S.Ct. 2257, 72 L.Ed.2d 861 (1982). The inclusion of the Sacramento Bee in the caption of these cases, contends the plaintiff, clearly indicates that these courts viewed the Bee as the real party in interest. A close reading of these cases, however, indicates that the courts involved viewed McClatchy as the real party in interest and not the Bee.

Plaintiff, nonetheless, cites *Country Set Division of Evan-Picone, Inc. v. Interstyle, Inc.,* 1978–2 Trade Reg.Rep. (CCH) ¶ 62,366 (S.D.N.Y. November 22, 1978), for the proposition that a division of a corporation can be a real party in interest, and can therefore be named as a defendant in a

lawsuit. In that case, Country Set, a subsidiary corporation of Evan-Picone, brought an anti-trust action in its own name against the defendant, Interstyle, Inc. The defendant, however, moved to dismiss Country Set from the action, contending that it was merely a trade name owned by Evan-Picone, and not itself a legal entity.

■ The court denied the motion to dismiss, finding that Country Set was not merely a trade name, but was in fact a subsidiary corporation of Evan-Picone. In that the subsidiary was itself a corporation, the court found that Country Set had the capacity to sue and be sued. *Id.* (*citing American Jerex Co. v. Universal Aluminum Extrusions, Inc.*, 340 F.Supp. 524 (E.D.N.Y.1972)). This case is clearly distinguishable from the present one, however, in that neither The Sacramento Bee, The Modesto Bee, nor The Fresno Bee are separate corporations, as the Magistrate has found. Instead, these newspapers are simply d.b.a.s of McClatchy Newspapers, which is the corporate entity in this action. In that the newspapers do not have a separate legal existence from McClatchy, the *Interstyle* case is completely inapplicable here, and the inclusion of the three newspapers is merely surplusage. In this sense, they may be dismissed from the action under Fed.R.Civ.P. 17(b). *See Iding v. Anaston*, 266 F.Supp. 1015 (N.D.Ill.1967) (court held that naming d.b.a.s was insufficient under Rule 17(b), and that actual corporate bodies were real parties in interest); *see also Standard Lime and Cement Co. v. United States*, 503 F.Supp. 938 (W.D. Mich.1980) (where corporate division retained only formal independent existence, parent corporation was real party in interest).

## DISMISSAL OF FRESNO AND MODESTO BEE EMPLOYEES

The defendants have also moved for the dismissal of The Fresno Bee, The Modesto Bee, and their employees George Gruner, Don Slinkard, Sanders LaMont, and Ray Nish for lack of jurisdiction over the person. The dismissal of the Fresno and Modesto Bees for lack of legal capacity renders this portion of the motion moot as to those defendants. The Court must thus determine only whether the four individual defendants should be dismissed for lack of personal jurisdiction.

■ In order to determine whether a federal court has personal jurisdiction over a defendant, the Ninth Circuit has developed a two-step analysis. First, the court must apply the long-arm statute of the state in which the court sits. *Hedrick v. Daiko Shoji Co., Ltd., Osaka*, 715 F.2d 1355, 1357 (9th Cir.1983). If the state statute indicates that jurisdiction is proper, the court must then decide whether the application of the statute itself comports with due process. *Id.* Many states' long-arm statutes reach as far as the Constitution and due process allow. In those states, therefore, there is no need to consider the first part of the analysis, for the long-arm statute is coextensive with the limitations of due process. *Id.*

■ Nevada's statute is apparently more limited than other states'. NRS § 14.065 provides in pertinent part that:

Any person who, in person or through an agent or instrumentality, does any of the acts enumerated in this subsection thereby submits himself and, if a natural person, his personal representative to the jurisdiction of the courts of this state as to any cause of action which arises from:

(a) Transacting any business or negotiating any commercial paper within this state;

(b) Committing a tortious act within this state;

(c) Owning, using, or possessing any real property situated in this state;

(d) Contracting to insure any persons, property, or risk located in this state at the time of contracting;

(e) Living in the marital relationship within this state notwithstanding subsequent departure from this state, as to all obligations arising for alimony, child support or property settlement, if the other party to the marital relation-

ship continues to reside in this state; or

(f) Violating NRS 207.400.

NRS § 14.065(2). This statute contemplates that it may reach only specifically enumerated acts which have taken place within the forum. *Shapiro v. Pavlikowski,* 98 Nev. 548, 654 P.2d 1030, 1031 (1982). *See Greenspun v. Del E. Webb Corp.,* 634 F.2d 1204, 1209 (9th Cir.1980); *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 417 (9th Cir.1977). Both the applicability of the state's long-arm statute and the statute's conformity with federal due process standards must therefore be examined.

The Nevada statute indicates that any person who commits a tortious act within the state submits himself to the jurisdiction of Nevada's courts as to any cause of action arising from that act. NRS 14.-065(2)(b). In order for a libel action to lie, Nevada requires, as do all other states, that there be a publication, or communication, of the alleged falsehood to a third person. In *Jones v. Golden Spike Corp.,* 97 Nev. 24, 623 P.2d 970 (1981), for example, the Nevada Supreme Court noted that "for the alleged defamatory words to be actionable they must be seen or heard by some person other than the plaintiff and defendant." *Id.* 623 P.2d at 971. Plaintiff has alleged that all defendants have some responsibility for the publication of the allegedly defamatory statements in this state. Therefore, because defendants all have some degree of complicity in an allegedly tortious act committed within this state, they all fall within grasp of the Nevada long-arm statute.

This is not the end of the inquiry, however, for federal law requires that the application of the long-arm statute itself must comport with due process in order for jurisdiction to lie.

■ In order to exercise jurisdiction over a non-resident defendant, the Ninth Circuit has noted that "due process requires ... certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Pacific Atlantic Trading Co. v. M/V Main Express,* 758 F.2d 1325, 1327 (9th Cir.1985) (*quoting International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). In addition, if the non-resident's activities in the forum are sufficiently substantial and continuous, general jurisdiction will lie even if the cause of action is not related to the defendant's activities in the state. *Id.* (*citing Perkins v. Benquet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952)). If the defendant's activities are not sufficiently pervasive to warrant general jurisdiction, however, the nature and quality of the forum related activities must be examined in relation to the specific cause of action to determine whether limited jurisdiction exists.

■ In the present case, the requirements for general jurisdiction have not been satisfied. None of the defendants has evinced a pattern of continuous and substantial activities within the state such as would allow this Court's assuming general jurisdiction over them. The few vacations or personal trips that these individual defendants have made into Nevada do not constitute the level of activities which must exist for general jurisdiction to lie. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984). Thus, jurisdiction in this case exists only if this Court can assert limited jurisdiction over the defendants.

In analyzing limited jurisdiction, the Circuit has adopted a three-pronged approach:

(1) The nonresident must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws. (2) The claim must be one which arises out of or results from the defendant's forum-related activities. (3) Exercise of jurisdiction must be reasonable.

*Pacific Atlantic, supra,* at 1327 (*citing Data Disc, Inc., v. Systems Technology Associates,* 557 F.2d 1280 (9th Cir.1977). In this case, defendants protest that the individual defendants have had insufficient contacts with the forum state to warrant limited jurisdiction, in that their employers, The Fresno Bee and The Modesto Bee have virtually no circulation in Nevada and derive less than 1% of their advertising revenues from this state. If the only basis for asserting jurisdiction over these defendants were through the Fresno and Modesto Bees' circulation, this contention might have merit. *But see Burt v. Board of Regents, University of Nebraska,* 757 F.2d 242 (10th Cir.1985), *petition for cert. filed sub nom. Connolly v. Burt,* — U.S. —, 106 S.Ct. 521, 88 L.Ed.2d 454 (1985) (single letter sent into the forum state is sufficient to assert limited jurisdiction over sender). Plaintiff argues, in contrast, that these defendants' responsibility to answer charges in this forum arises not because of their acts as employees of the Fresno and Modesto Bees, but rather because of their alleged complicity in the preparation of the articles. Thus, defendants' statistics regarding the Fresno and Modesto Bee's circulation and advertising in Nevada are irrelevant, for the major emphasis is on the preparation of the articles, their circulation in Nevada by McClatchy, and the extent to which these four defendants aided in that effort. In this sense, this Court must find that personal jurisdiction exists over these defendants.

The Ninth Circuit has recently concluded that "a single tortious act, standing alone, can satisfy all three requirements under *Data Disc,* if the act is aimed at a resident of the state or has effects in the state." *Paccar International, Inc. v. Commercial Bank of Kuwait,* 757 F.2d 1058, 1064 (9th Cir.1985) (*citing Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 1486–87, 79 L.Ed.2d 804). The Circuit has further recognized that "the 'effects' doctrine may also serve as a basis for a finding of *in personam* jurisdiction." *Gilbert v. DaGrossa,* 756

F.2d 1455, 1459 n. 4 (9th Cir.1985) (*quoting Calder, supra* at 104 S.Ct. 1487).

The most recent statement of the "effects" doctrine has come from the Supreme Court in *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). In that case, the respondent, a California entertainer, brought suit in California state courts against the National Enquirer, a Florida based magazine, and several of the magazine's employees, also based in Florida. The respondent's complaint sounded in libel, alleging that an Enquirer article falsely implied that the plaintiff's career as an entertainer was in jeopardy because she drank to excess. The petitioners objected to the California court's assertion of jurisdiction over them, in that they personally had only minimal contacts with the forum state, had no direct economic interest in the magazine's sales in California, and were not otherwise responsible for the circulation of the article in that state.

The Supreme Court found the petitioners' arguments unpersuasive. California courts could assert personal jurisdiction over them, the Court noted, for

[t]heir intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devasting impact upon respondent. And they knew that the brunt of the injury would be felt by respondent in the State in which she lives and works and in which the *National Enquirer* has its largest circulation. Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article. *Id.* 104 S.Ct. at 1487 (*citing World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *Kulko v. Superior Court,* 436 U.S. 84, 97–98, 98 S.Ct. 1690, 1699–1700, 56 L.Ed.2d 132 (1978); *Shaffer v. Heitner,* 433 U.S. 186, 216, 97 S.Ct. 2569, 2586, 53 L.Ed.2d 683 (1977)). Thus, the Court concluded, that the petitioner has had no personal physical contact with the forum state

744

is irrelevant where he has acted in an intentional manner so as to cause an allegedly tortious "effect" in the forum state.

Assertion of jurisdiction in this case requires the Court to determine whether defendants Gruner, Slinkard, LaMont, and Nish were "primary participants in an alleged wrongdoing intentionally directed at a [Nevada] ... resident." *Id.* at 1486 n. 6. Plaintiff has alleged that these named individuals "had a responsible part in causing the publication" of allegedly libelous articles regarding the plaintiff, and that they acted with "knowledge that or with reckless disregard of whether each of ... [the articles] was misleading, false, and libelous...." Complaint at 8 & 11. It was not their acts as managers of the Fresno and Modesto Bees that constituted acts giving rise to jurisdiction, plaintiff contends, but their actions in preparation of all the articles and their publication in all the newspapers, especially The Sacramento Bee, that constitute sufficient contacts. Under *Calder,* these allegations are sufficient to form the basis for exercise of personal jurisdiction over these defendants.

Initially, the allegedly libelous articles in this case concern the forum state activities of a resident of Nevada allegedly resulting in harm to his career. Although the plaintiff is known nationwide by virtue of his prominence as a United States Senator and status as a national political figure, it is clear that the possible harm to plaintiff's reputation will be centered in the state which elected him to high office. In this sense, it is clear that the articles were directed at a Nevada resident. Although the Fresno and Modesto Bees have little circulation in this State, the Sacramento Bee enjoys a wide circulation and readership here. By publishing an article in the Sacramento Bee, defendants knew that there would be a substantial impact on Laxalt in Nevada.

■ It is true that in *Calder* the libelous publication had its largest circulation in the forum state, and that McClatchy's largest publication is outside of this forum. Under the "effects" test, however, the focus rests upon that act of "intentionally direct[ing]" an alleged libel at a resident of the forum. *Id.* at 1487. The location of the highest volume of circulation is thus not a consideration under this test. *Cf. Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 1479, 79 L.Ed.2d 790 (1984) (false statements harm both the subject and the readers, and the forum state may employ its libel laws to discourage deception); *Burger King Corp. v. Rudzewicz,* — U.S. —, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (individual injured in forum state should be able to seek redress in forum from persons who knowingly cause injury in that state). Because of the defendants' alleged responsibility in the preparation of these articles, and because these allegedly libelous articles were directed into Nevada, at a Nevada resident, these defendants satisfy the "effects" test. This being so, asserting of personal jurisdiction over them is proper under *Data Disc, supra.* See *Paccar International, Inc. v. Commercial Bank of Kuwait,* 757 F.2d 1058, 1068 (9th Cir.1985).

The Court cautions, however, that its holding is based on the allegations contained in the pleadings regarding the defendants' responsibility for the preparation and Nevada circulation of these articles. Although the pleadings indicate that defendants were to some extent responsible, neither the plaintiff nor the defendants have shown the *precise* extent of the defendants' participation in this endeavor. During discovery, it may come to light that these individuals had nothing to do with the development and publication of these articles whatsoever. If this is indeed true, then this Court might be without jurisdiction over them, and a motion to dismiss them from the action at that time would be proper. Thus, the Court will deny the present motion to dismiss without prejudice, with leave to refile it should circumstances warrant upon the completion of discovery.

MOTION TO DISMISS CIVIL CONSPIRACY CLAIM

Defendants' third contention in their motion to dismiss regards the plaintiff's claim

for civil conspiracy. Basically, defendants claim that an action for civil conspiracy cannot lie under these circumstances, in that all of the actors were at all relevant times employed by McClatchy Newspapers, and were acting in the course and scope of their employment. Therefore, the defendants claim that they were essentially one legal body, and incapable of the act of conspiracy.

In that this is a diversity case, this Court is obliged to apply the law of the State of Nevada on substantive issues such as this count. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1937). The most recent statement of the law of this state came in *Collins v. Union Federal Savings and Loan Ass'n,* 99 Nev. 284, 662 P.2d 610 (1983). In that case, a debtor filed multiple counts against a bank and its officers, alleging that the defendants had, among other things, combined together in a civil conspiracy to deprive him of economic advantage and contractual relationships. The defendants moved for summary judgment on the civil conspiracy count, contending that they had acted in their capacities as bank officials at all relevant times, and that they were thus incapable of combining with each other or the bank to form a civil conspiracy.

The Supreme Court of Nevada agreed with the defendants' rationale. It noted that

An actionable civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage.... Agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage.

*Id.* 662 P.2d at 622. In Nevada, therefore, a corporation cannot conspire with its employees if those employees are acting within the course and scope of their employment.

The *Collins* court also refused to recognize a cause of action for conspiracy arising out of the actions of the employees between themselves. "Collins alleged that the respondents conspired with one another ..." to accomplish an unlawful objective," the court noted. *Id.* 662 P.2d at 622. In order to establish a claim for civil conspiracy among the individual defendants, however, Collins would have had to allege that they were acting as individuals for their individual advantage, and not in the course and scope of their employment, the court noted. Because Collins had failed to allege that the individuals were acting as individuals and not as agents of their employer, the court found that no action for conspiracy could lie. *Id; see Stathos v. Bowden,* 728 F.2d 15, 21 (1st Cir.1984) (corporate officers, acting in the course and scope of their employment, cannot conspire amongst themselves under § 1985(3)); *Girard v. 94th St. & 5th Ave. Corp.,* 530 F.2d 66 (2nd Cir.), *cert. denied,* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *Baker v. Stuart Broadcasting Co.,* 505 F.2d 181 (8th Cir.1974); *Dombowski v. Dowling,* 459 F.2d 190 (7th Cir.1972); *see also Scott v. City of Overland Park,* 595 F.Supp. 520, 527 (D.Kan.1984) (general rule is that agents of a corporation constitute a single entity and therefore cannot conspire with each amongst themselves).

In this case, the plaintiff has specifically alleged that all defendants were acting within the course and scope of their employment with McClatchy when the alleged tort occurred. *See* Complaint para. 15–24. Plaintiff has therefore admitted that these defendants were incapable of conspiring with McClatchy or with themselves. Additionally, plaintiff has alleged that The Sacramento Bee, The Fresno Bee, and The Modesto Bee are wholly owned subsidiaries of the defendant McClatchy Newspapers. Thus, the newspapers had no separate legal existence from McClatchy when the alleged tort occurred. It was, therefore, impossible for a civil conspiracy to have occurred, in that all of the actors were part of the same legal body. *See*

*Corbit v. J.I. Case Co.*, 70 Wash.2d 522, 424 P.2d 290 (1967). The motion to dismiss this portion of the complaint will thus be granted.

## MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS

Plaintiff has moved, pursuant to Fed.R. Civ.P. 12(b)(6), to dismiss the defendants' two counterclaims for failure to state a claim for which relief may be granted. Defendants' first counterclaim is a "Bivens" action for the alleged violation of first amendment rights. In this claim, the defendants allege that Laxalt has used his power and influence as an United States Senator to punish the claimants and to burden and chill the exercise of their first amendment rights.

In *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the petitioner asked the Supreme Court to imply a cause of action under the fourth amendment for alleged constitutional violations committed by a federal agent acting under the color of federal law. Petitioner's home had been invaded by federal agents, searched completely, and petitioner had been arrested and later interrogated. All these acts occurred without probable cause to suspect the petitioner of having committed a crime. These actions, in petitioner's view, constituted fourth amendment violations for which he should be able to recover damages. The respondent argued that no cause of action could be implied under the fourth amendment where Congress had not statutorily authorized one, and that petitioner's proper avenue for relief was therefore in state tort law.[1] *Id.* at 390, 91 S.Ct. at 2002.

The Court disagreed with the respondent, and found that an implied cause of action did exist for federal officials' alleged

fourth amendment violations. The amendment, found the Court,

> guarantees to citizens of the United States the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority. And "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be able to adjust their remedies so as to grant the necessary relief."

*Id.* at 392, 91 S.Ct. at 2002, (*quoting Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)). Thus, the Court found it proper to imply the cause of action for alleged violations under color of federal law, despite the absence of any federal statutes creating such an action.

The Court did note, however, that if Congress had created an alternative remedy which it specifically declared to be an equally effective substitute for direct remedy under the Constitution, implication of a remedy by the Court would be improper. *Id.* at 397, 91 S.Ct. at 2005; *Carlson v. Green*, 446 U.S. 14, 18, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15 (1980); *Davis v. Passman*, 442 U.S. 228, 245, 99 S.Ct. 2264, 2277, 60 L.Ed.2d 846 (1979). In addition, the Court found that where the case involves "special factors counselling hesitation in the absence of affirmative action by Congress," it should also refuse to imply a remedy. *Bivens, supra*; 403 U.S. at 397, 91 S.Ct. at 2005; *Carlson v. Green, supra*, 446 U.S. at 18–19, 100 S.Ct. at 1471; *Davis v. Passman, supra*, 442 U.S. at 245–47, 99 S.Ct. at 2277–78.

Thus, the *Bivens* action creates a private cause of action against federal officials just as 42 U.S.C. § 1983 creates an action against state officials. Along this line, the Ninth Circuit has stated that "the only difference between a § 1983 claim and a *Bivens* claim is that, where the constitutional infringer has acted under color of

---

1. It is clear that if these had been *state* officials, a cause of action would have existed under 42 U.S.C. § 1983. This statute has, since the time of the Civil War, created a federal remedy for the violation of federal rights committed "under color of state law." The courts have long held,

however, that this statute reaches only state officials, and that federal authorities are free from its restraints. Until *Bivens*; therefore, there was no private remedy for violations of federally created rights committed by federal officials acting under color of federal law.

state law, § 1983 is applicable and where the constitutional infringer acts under color of federal law, a *Bivens* action can lie." *Jacobson v. Tahoe Regional Planning Agency*, 558 F.2d 928 (9th Cir.1977) *rev'd in part, aff'd in relevant part sub. nom Lake Country Estates v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1978). Most courts have, therefore, applied § 1983 law to *Bivens* claims. *Id.* (citing *Brubaker v. King*, 505 F.2d 534 (7th Cir.1974)).

The first element of a *Bivens* claim is thus proof that the official acted under color of federal law. In the present case, McClatchy argues that Laxalt acted under color of federal law when he wrote on Senate stationery a letter demanding that the articles be retracted and that information and sources for the articles be supplied directly or indirectly to law enforcement agencies. In that the Senator signed his name over the caption "U.S. Senate" on the stationery, McClatchy alleges that he impliedly threatened to use the power and authority of his office to retaliate against them if they did not comply.

▇ These allegations are insufficient to indicate that Laxalt's actions were taken under color of federal authority. Initially, all actions of a government official are not, simply by virtue of the official's governmental employ, accomplished under the color of federal law. The Ninth Circuit has stated in interpreting § 1983 that a state official must be clothed with the legitimacy of the government, and must purport to act thereunder in order for conduct to be considered "under color of state law." *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. August 27, 1985), *citing Monroe v. Pape*, 365 U.S. 167, 172–87, 81 S.Ct. 473, 476–84, 5 L.Ed.2d 492 (1961). *See Traver v. Meshriy*, 627 F.2d 934 (9th Cir.1980) (off duty police officer acted under color of state law while working part time as a bank security guard where the police department had a role in selecting officers for such "secondary hiring" and where the officer admittedly responded to a call for help from a bank teller in his official capacity);

*Norton v. Liddel*, 620 F.2d 1375 (10th Cir. 1980) (position as sheriff does not make every action one under color of state law; only when using power granted by the state does sheriff act under color of state law). Perhaps Senator Laxalt can never shed entirely the cloak of the government's legitimacy, but it is clear that he was not purporting to act thereunder in writing the demand letter to McClatchy.

First, Laxalt was required under state law to write the letter demanding retraction. Nevada law establishes that the plaintiff in a libel action cannot recover general or exemplary damages unless he first specifically identifies the allegedly libelous statements and demands their retraction. NRS § 41.336. Only if the plaintiff makes such a demand, and the defendant refuses to publish the retraction may the plaintiff recover more than special damages. NRS § 41.337. Laxalt therefore had to write this demand letter in order to be able to sue for general and exemplary damages. In so doing, he acted as would have any private citizen considering the possibility of filing suit for libel. The fact that Laxalt is a United States Senator does not automatically convert this action as occurring under color of federal law.

Indeed, finding that Laxalt, by simple virtue of his office, purported to act under federal law when writing his demand would create dangerous precedent. All federal officials would then be dissuaded from making such demands to clear their names while still in office, for fear that their actions would be seen as occurring under federal law, thereby inviting a *Bivens* suit. This turn of events would be in contravention of the principle of the libel cause of action, in that it would strongly discourage wronged parties from seeking legal redress of their grievances.

Similarly, the Supreme Court has held that public officials have a stronger chance of clearing their names through the media than do private citizens, and that they must exercise that opportunity. As the Court noted in *Gertz v. Robert Welch, Inc.*, 418

U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)

> [t]he first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby minimize its adverse impact on reputation. Public officials ... usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy.

*Id.* at 344, 94 S.Ct. at 3009. Thus, a public official must, to a certain extent, make demands that alleged libels be retracted. In that the official is required to do so, the simple fact that they are made emphatically and on official stationery does not indicate that they were also made under color of state or federal law.

In addition, Laxalt's demand that information and source material be turned over to various law enforcement bodies was also not taken under color of federal law. Any individual can demand that information in the possession of a newspaper be turned over to the police for further investigation. The simple fact that one is an United States Senator does not automatically convert such a demand into an official one, unless some further power, such as the subpoena power of a Senate committee, backs up the demand. In this sense, none of Laxalt's actions taken in the prosecution of this suit occurred under the color of federal law. The Senator has proceeded, as any other private citizen would have, to clear his name of any implication of misconduct and to recover damages for an alleged libel.

▮ *Bivens* actions also require that a claimant demonstrate that the official action has deprived him of some federal right. Thus, even if the Senator had been acting under color of federal law in this case, none of his actions has worked a deprivation of any of McClatchy's federally secured rights. McClatchy claims that by

demanding the confidential information and sources used in the preparation of the articles, Laxalt sought to expose the individuals involved to bodily harm and to "chill" the newspapers' exercise of their first amendment privilege by preventing further access to confidential sources. This allegation is insufficient to support a *Bivens* claim, however, in that there is no constitutionally secured right which protect a reporter's confidential sources.

In *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), a reporter sought to protect sources used in preparing a story about the manufacture and use of hashish from the inquiries of a state grand jury. The reporter argued that the first amendment afforded him a right to withhold this information, in order to ensure the continued existence of access to confidential informants. The Court, however, held that the state's interest in controlling crime through the functioning of the grand jury vastly outweighed any interest the reporter might have in the confidentiality of his sources, and that no privilege for news reports existed under the first amendment. *Id.* at 701–02, 92 S.Ct. at 2666–67. *See Lewis v. United States,* 517 F.2d 236, 238 (9th Cir.1975).

Although the Court has not yet held that a reporter must reveal his sources in the context of a civil trial,[2] it has held that the editorial process is subject to regular discovery when conducted pursuant to a libel action. In *Herbert v. Landa,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), the Court stated that a plaintiff must focus on defendant's state of mind in order to prove the existence of defendant's liability in a libel action. In order to be liable, the court noted, "the alleged defamer of public officials or of public figures must know or have reason to suspect that his publication is false." *Id.* at 161, 99 S.Ct. at 1641. Therefore, the court concluded, it is impossible to allow a first amendment privilege to shield the editorial process from the

---

**2.** The circuits are split on the issue. *Compare Miller v. Transamerica Press, Inc.,* 621 F.2d 721 (5th Cir.1980) (privilege exists under first amendment) *with Lewis v. United States,* 517 F.2d 236 (9th Cir.1975) (no privilege exists).

scrutiny of civil discovery, in that the resolution of all libel actions rests upon the discovery of this information.

Similarly, confidential sources and other information in the context of libel suits can also be considered crucial to the proper resolution of the intent question. In *Miller v. Transamerican Press, Inc.*, 621 F.2d 721 (5th Cir.1980) *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981), for example, the plaintiff brought suit for libel against the publishers of "Overdrive" magazine. The magazine's allegedly libelous article indicated that the plaintiff had swindled a pension fund out of $1.6 million through a fraudulent loan. During the course of discovery, the plaintiff learned that the source of the article had been a confidential informant, and filed three motions to compel the disclosure of that informant's identity. *Id.* at 723. The district court ultimately concluded that the informant's identity would go to the heart of the malice issue, and allowed discovery. *Id.*

The Fifth Circuit upheld the lower court's ruling. Although the court did find a first amendment privilege which protected the disclosure of confidential informant's identity, it also noted that "the privilege is not absolute and in a libel case ... the privilege must yield." *Id.* at 725. A three part test was developed by the court to indicate when the privilege could be invaded by the process of civil discovery. First, the court found that the information sought must be relevant to the case. Second, the information must not be available through alternative means. Lastly, the court required a compelling interest in disclosure of the information for discovery to be allowed.

In this case, the court found that the information was clearly relevant, in that the identities of the informants was crucial to the determination of the malice issue. The plaintiff also had no other way to attain the identities, in that the defendant was the only one with that knowledge. Finally, the court noted that compelling interests existed for the disclosure of this information, in that examination of the confidential informants was the only way in which the plaintiff could prove the existence of malice on the part of the defendant.

As in *Miller* no first amendment privilege can shield the defendants' in this case, even if such a privilege does exist normally. The number and credibility of confidential sources used in the preparation of these articles are clearly relevant, in that they will have strong influence on the jury's ability to determine the existence of actual malice. In addition, it appears that the only source for this information is McClatchy, as only that organization can tell which of its reporters contacted which informants. The interest in disclosure of this information, moreover, is compelling. The information, as seen above, is relevant, but it may also be the only evidence which will show malice on McClatchy's part. *See Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 224 Ct.Cl. 583 (1st Cir.1980); *Carey v. Hume*, 492 F.2d 631 (D.C.Cir.1974) *cert. dismissed* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974). As in *Miller*, therefore, any first amendment privilege will also be denied by the Court in this context. In that no first amendment privilege exists as to a reporter's confidential sources, the allegation surrounding Laxalt's demands for disclosure of this information cannot form the basis of a *Bivens* claim.

McClatchy asserts, in addition, that the filing of this suit itself works a constitutional deprivation, as Laxalt knows or should know that he cannot prevail, and that he has filed this action merely as a harassment device. Whereas it is true that Senator Laxalt bears a heavy burden in proving that the statements were indeed libelous, he has not chilled McClatchy's first amendment rights by filing this suit.

In support of the proposition that the filing of a libel action can work a first amendment deprivation, McClatchy relies heavily on *Cate v. Oldham*, 707 F.2d 1176 (11th Cir.1983). In that case, Mary Bradham had been beaten to death by her estranged husband, despite her repeated complaints about her husband's physical

assaults to the local police. Cate, an attorney representing Bradham's estate, instituted a wrongful death claim against the State of Florida and various state officials, alleging that they had negligently failed in their efforts to prosecute Bradham's husband for battery, and that their negligence resulted in Bradham's death. The state court granted summary judgment and attorney's fees to the state, but the attorney's fees were reversed on an appellate finding that the action was not frivolous.

Subsequently, the state of Florida filed an action against Cate for malicious prosecution. Cate responded by filing a § 1983 action, in which he contended that the State and state officials, when sued in their official capacities, could not file a malicious prosecution action against the person who had sued the government. Otherwise, argued Cate, one's first amendment right to petition the government by bringing legal actions would be severely abridged.

The Eleventh Circuit found that the case posed an important constitutional issue on the scope of the first amendment right to petition. It noted, however, that the Supreme Court of Florida had never interpreted the tort of malicious prosecution in the context of state officials sued in their official capacities. Finding that certification to the state court for construction of the state law question could moot the constitutional issue, the court granted only preliminary injunctive relief and stayed the malicious prosecution action pending answers to the certified questions. The court did note that interim protection of Cate's first amendment right to petition clearly outweighed any damage to the state officials in preventing the malicious prosecution action from continuing pending resolution of the entire case.

As the Magistrate noted in her report, *Cate* differs from the present case in several important respects. The first amendment right involved in *Cate* was that of the private citizen's ability to petition the government for redress of grievances. In the present case, a different first amendment right is involved, namely the protec-

tion of free speech and press. In *Cate*, moreover, the lawsuit which the federal court stayed was a malicious prosecution action brought by the state and state officials in their official capacities against private citizens. The *Cate* suit was clearly a governmentally sanctioned attempt to penalize and deter the filing of suits against the government. This case, in contrast, presents a libel action brought by a government official in his private capacity to clear his name of and recover damages for an alleged falsehood. Senator Laxalt has never explicitly or implicitly represented that the federal government is party to or stands behind him in this suit. In this sense, the claimants' citations to *Cate* are misplaced.

In addition, even assuming that the Senator's filing this suit has "chilled" the claimant's first amendment rights, the Supreme Court has noted that defendants in libel actions must bear this potential chill in light of the generous standards of *New York Times v. Sullivan.* In *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), the Court also considered argument by the respondents that in addition to the usual personal jurisdiction standards, the Court must also consider whether California's exercise of personal jurisdiction over them would chill their first amendment rights.

The Court rejected this suggestion. "[T]he potential chill on protected First Amendment activity stemming from libel and defamation actions is already taken into account in the constitutional limitations on the substantive law governing such suit." *Id.* 104 S.Ct. at 1488 (*citing New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). No other special procedural protections are necessary to protect libel defendants, the Court concluded, because the *New York Times* standards already constitute significant protection, and further safeguards would amount to "double counting." *Calder, supra* at 1488. *See also Dun & Bradstreet*

*v. Greenmoss Builders, Inc.,* —— U.S. ——, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (Burger, C.J., and White, J., concurring) (actual malice standard of *New York Times* is too severe a burden to impose on an allegedly defamed public official).

 In this case, it is clear that the filing of a libel action cannot be considered to "chill" first amendment rights. As in *Calder,* the defendants' protection from any potential first amendment damage lies in the standards of *New York Times,* and not in a first amendment *Bivens* action. To permit defendants to bring this counterclaim would be to allow exactly the form of "double counting" which the Court decried in *Calder.* In addition, allowing this claim would substantially prejudice the ability of a public official to bring a libel action, in that he would be assured of facing a first amendment counterclaim when attempting to recover damages for the alleged libel.

McClatchy essentially asks this Court to grant it immunity from suit under the first amendment. In that the *New York Times* standard already accomplishes this, in practicality, it would be extremely prejudicial for this Court to allow this counterclaim to lie. *See Dun & Bradstreet, supra; Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 586, 224 Ct.Cl. 583 (1st Cir. 1980) (*citing,* Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer,* 61 Va.L.Rev. 1349, 1373 (1975)).

## ABUSE OF PROCESS COUNTERCLAIM

McClatchy further contends that Laxalt has committed the tort of abuse of process in filing this libel action. This Court is obliged once again to apply state law of decision regarding this counterclaim. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1937).

In Nevada, the two essential elements of abuse of process are: (1) an ulterior purpose behind the issuance of process; and (2) a willful act in the use of process not proper in the regular conduct of the proceeding. *Bull v. McCuskey,* 96 Nev. 706,

615 P.2d 957 (1980). *See Nevada Credit Rating Bur. v. Williams,* 88 Nev. 601, 503 P.2d 9 (1972). McClatchy argues that the mere filing of the complaint is abusive in this case, in that Laxalt knows he cannot ultimately succeed on the merits. Laxalt, on the other hand, argues that claimants have failed to state a claim for abuse of process, in that the filing of a complaint cannot constitute the willful act required to establish the tort. *See Blue Goose Growers, Inc. v. Yuma Groves, Ind.,* 641 F.2d 695 (9th Cir.1981); *Ging v. Showtime Entertainment, Inc.,* 570 F.Supp. 1080 (D.Nev.1983). McClatchy does not dispute that the filing of the complaint in most states cannot be the willful act required by the tort, but contends that the law of the State of Nevada indicates otherwise.

Nevada law, however, does not support McClatchy's position. In *Bull v. McCuskey, supra,* an attorney had filed a malpractice action against a physician, but was unsuccessful in winning a judgment against the doctor. Thereafter, the doctor brought suit against the lawyer, contending that the malpractice action was filed merely as a tactic to coerce a settlement, and that there was no merit to the suit. The trial jury returned a substantial verdict for the doctor, but the attorney appealed, contending that the evidence did not establish the existence of the abuse of process tort.

The Nevada Supreme Court disagreed with the lawyer, and found that there was sufficient evidence to establish the tort. The attorney's "offer to settle the case for the minimal sum of $750 when considered in the light of his failure to investigate before filing suit and the total absence of essential expert evidence" indicated to the court that process was being abused in this case. *Id.* This language, under McClatchy's interpretation, indicates that the tort of abuse of process can lie in Nevada where the complaint is filed with the ulterior purpose of coercing a settlement, or some other improper motive.[3]

**3.** McClatchy also places much reliance on the

statement of the court that "the process (com-

This is a severely strained interpretation of the *Bull* case. The Nevada court clearly indicated the attorney *abused* the process available to him by offering to settle the case for a minimal sum and by failing to present proper evidence at trial. *Id.* It was the actions which the lawyer took (or failed to take) *after* the filing of the complaint which constituted the abuse of process, and not the filing of the complaint itself, which constituted the tort in the *Bull* court's estimation. *See Blue Goose, supra,* and *Ging, supra.* Thus, Nevada follows the rule, as does an overwhelming majority of states, that the mere filing of the complaint is insufficient to establish the tort of abuse of process. *See Curiano v. Suozzi,* 63 N.Y.2d 113, 480 N.Y.S.2d 466, 469 N.E.2d 1324, 480 N.Y.S.2d 466 (1984); *Batten v. Abrams,* 626 P.2d 984 (Wash. App.1982); *Mini-Togs, Inc. v. Young,* 354 So.2d 1389 (La.App.1978); *Fite v. Lee,* 11 Wash.App. 21, 521 P.2d 964 (1974); *Jackson & Sherer, Inc. v. Washburn,* 209 Kan. 321, 496 P.2d 1358 (1972); *Farmers Gin Co. v. Ward,* 73 N.M. 405, 389 P.2d 9 (1964); *Edmonds v. Delta Democrat Publishing Co.,* 230 Miss. 583, 93 So.2d 171 (1957); *Moffett v. Commerce Trust Co.,* 283 S.W.2d 591 (Mo.1955); *Geier v. Jordan,* 107 A.2d 440 (D.C.App.1955); *Pimentel v. Houk,* 101 Cal.App.2d 884, 226 P.2d 738 (1951); *see also Blue Goose, supra; Ging, supra; Fong v. Merena,* 66 Hawaii 72, 655 P.2d 875 (1982) (abuse of process counterclaim against libel plaintiff without merit where plaintiff had merely instituted suit against defendant); Prosser, *Law of Torts,* pg. 856 (4th ed. 1971).

█ It is clear that McClatchy has failed to state a claim for abuse of process

under Nevada law. As seen above, Nevada courts have held that the filing of a complaint alone cannot constitute the willful act necessary for the tort to lie. This, however, is all that McClatchy has alleged. There is no allegation of abusive measures taken after the filing of the complaint, such as minimal settlement offers or huge batteries of motions filed solely for the purpose of coercing a settlement. Thus, the Court finds that McClatchy has failed to satisfy its pleading burden as far as this tort is concerned, and the motion to dismiss should be granted on this count as well.

IT IS, THEREFORE, HEREBY ORDERED that the Magistrate's reports and recommendations regarding plaintiff's and defendants' motions to dismiss be *affirmed and adopted.*

IT IS FURTHER ORDERED that the defendants' motion to dismiss be granted and denied in the following respects:

A. The motion to dismiss The Sacramento Bee, The Fresno Bee, and The Modesto Bee pursuant to Rule 17(b) is GRANTED.

B. George Gruner, Don Slinkard, Sanders LaMont, and Ray Nish's motion to dismiss for lack of personal jurisdiction is DENIED, WITHOUT PREJUDICE to refiling of the motion after the close of discovery pursuant to a schedule order later by the Court.

C. The motion to dismiss plaintiff's cause of action for civil conspiracy is GRANTED.

IT IS FURTHER ORDERED that the plaintiff's motion to dismiss the defend-

---

plaint and summons) charging Dr. McCuskey with malpractice was misused for the ulterior purpose of coercing a nuisance settlement" *Bull, supra,* 96 Nev. 706, 615 P.2d at 960. This is unfortunate language. Read by itself, the sentence seems to indicate that the filing of a complaint, coupled with an improper motive, establishes the elements of abuse of process. Read in context of the entire opinion, however, the phrase clearly indicates that the available process in the case (complaint and summons) was abused by the subsequent acts of the lawyer. The availability of process is thus a prerequisite

to the tort, in that there must be process extant which the defendant abuses in order for the tort to lie. The mere filing of a complaint with malicious intent is insufficient, or there must also be some subsequent act to filing which abuses the process. As Prosser notes, "[a]buse of process differs from malicious prosecution in that the gist of the tort is not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish." Prosser, *Law of Torts,* page 856 (4th Ed.1971).

ants' counterclaims for failure to state a claim is GRANTED.