VIRGIL D. DUTT, Appellant and Cross-Respondent, v. RICHARD E. KREMP, M.D.; RAYMOND L. SWARTS, M.D.; PAUL S. CLARK, M.D.; and DAVID C. JOHNSON, M.D., Respondents and Cross-Appellants.

No. 22329

April 27, 1995                                             894 P.2d 354

*Wait & Shaffer,* Reno, *Lillick & Charles* and *Tristam B. Brown* and *James J. Corbelli,* San Francisco, for Appellant/Cross-Respondent.

*Carl M. Hebert,* Reno, for Respondents/Cross-Appellants.

## OPINION

By the Court, SHEARING, J.:

This appeal arises from a jury verdict and judgment against attorney Virgil Dutt ("Dutt") in favor of respondent physicians

in an action for malicious prosecution and abuse of process. Dutt had filed a malpractice action against the physicians on behalf of Jack Rentnelli ("Rentnelli"), which Rentnelli later voluntarily dismissed. This dismissed malpractice action formed the basis of the physicians' allegations of malicious prosecution and abuse of process against both Dutt and Rentnelli. At trial, at the close of the physicians' case, the district court dismissed the action against Rentnelli and awarded him costs. The case against Dutt was submitted to a jury, which returned a verdict against Dutt. Dutt appeals the judgment against him. The physicians cross-appeal on the issue of costs.

The issues on appeal are whether the court rather than the jury should have decided certain issues, and whether there was sufficient evidence to support a verdict of malicious prosecution or abuse of process against Dutt.

## FACTS

In February and March, 1985, respondent physicians treated Rentnelli at a local hospital for an ailment that was eventually diagnosed as tuberculous meningitis and hydrocephalus. Rentnelli was given medication, and after approximately two weeks was discharged from the hospital. Rentnelli's son ("John"), testified that after treatment Rentnelli's condition continued to deteriorate, that John tried to reach one of the physicians by telephone, but was only allowed to speak with the staff and not with the doctor. Rentnelli's condition deteriorated to the point that after ten days John decided to seek new physicians and flew Rentnelli to a Santa Barbara hospital where a new doctor surgically implanted a shunt to relieve pressure on his brain. Immediately after this treatment, Rentnelli improved markedly. The Santa Barbara doctor told Rentnelli's son that if he had not brought Rentnelli in when he did, Rentnelli might not have lived.

Based on this series of events, Rentnelli and his family believed that he had not received proper care by respondent physicians and consulted Rentnelli's attorney, Virgil Dutt. Dutt interviewed Rentnelli and John, and obtained the medical records from the physicians in Reno and Santa Barbara. Dutt reviewed the records and researched both medical literature on meningitis and hydrocephalus and legal authorities regarding malpractice actions. Based on this review and research, Dutt filed a malpractice action against the physicians on December 30, 1985. After the action was filed, Dutt continued his factual investigation and research. Upon learning of the Medical Quality Foundation in Virginia, Dutt agreed with one of physicians' counsel that he would submit the Rentnelli records to that foundation for evaluation; if the Foundation supported his claims, he would continue to

prosecute the action, if not, Dutt would dismiss it. The Medical Quality Foundation concluded that given Rentnelli's condition, the one-month between Rentnelli's initial admission in Reno and the eventual shunt placement in Santa Barbara "would not produce significant brain damage," and that there was no provable negligence apparent from the records. On January 30, 1987, Dutt dismissed the malpractice action.

On December 29, 1987, the physicians filed their complaint for malicious prosecution and abuse of process against Rentnelli and Dutt. The court granted Rentnelli's motion for a directed verdict at the close of the physicians' case. The case against Dutt was tried before a jury which returned a verdict in the total amount of $40,000[1] in favor of the physicians against Dutt.

## DISCUSSION

The questions presented in this appeal are: (1) whether the issue of probable cause should have been determined by the court rather than submitted to the jury, and (2) whether there was sufficient evidence to support the jury's verdict that Dutt was guilty of malicious prosecution or abuse of process.

The court instructed the jury on both malicious prosecution and abuse of process but the jury did not specify on which cause of action it based its verdicts. This court has held that the difference between the two torts is that the action for abuse of process hinges on the misuse of regularly issued process, in contrast to malicious prosecution, which rests upon the wrongful issuance of process. Nevada Credit Rating Bur. v. Williams, 88 Nev. 601, 606, 503 P.2d 9, 12 (1972). Malice and want of probable cause are necessary elements for recovering in an action for malicious prosecution, but they are not essential to recovery for abuse of process. *Id.* The fundamental elements of abuse of process are an ulterior purpose and a willful act in the use of process not proper in the regular conduct of the proceeding. *Id.* Because the jury did not specify which it found, both causes of action will be discussed.

### Malicious Prosecution

The elements that must be proved in a malicious prosecution action in addition to the filing of a prior action against the plaintiffs are: (1) a lack of probable cause to commence the prior action; (2) malice; (3) favorable termination of the prior action;

---

[1]The jury awarded $15,000.00 to Dr. Swarts, $5,000.00 to Dr. Johnson, $15,000.00 to Dr. Kremp, and $5,000.00 to Dr. Clark.

and (4) damages. *See* Chapman v. City of Reno, 85 Nev. 365, 369, 455 P.2d 618, 620 (1969). The first question presented in this appeal is whether, as appellant contends, the trial court erred by refusing to rule on the issue of probable cause.

When there is no dispute concerning the facts upon which an attorney acted in filing the prior action, the question of whether there was probable cause to institute the prior action is purely a legal question to be answered by the court. Bonamy v. Zenoff, 77 Nev. 250, 252, 362 P.2d 445, 447 (1961). Here, the trial court submitted the question of probable cause to the jury. We hold that this was error, because the facts upon which Dutt relied in filing the malpractice action are essentially undisputed.[2] The existence of probable cause was a legal question which, under *Bonamy,* the district court should have decided.

In Sheldon Appel Co. v. Albert & Oliker, 765 P.2d 498, 504 (Cal. 1989), the California Supreme Court offered a persuasive rationale for the requirement that the court, rather than the jury, determine the existence of probable cause:

> The question whether, on a given set of facts, there was probable cause to institute an action requires a sensitive evaluation of legal principles and precedents, a task generally beyond the ken of lay jurors, and courts have recognized that there is a significant danger that jurors may not sufficiently appreciate the distinction between a merely unsuccessful and a legally untenable claim. To avoid improperly deterring individuals from resorting to the courts for the resolution of disputes, the common law affords litigants the assurance that tort liability will not be imposed for filing a lawsuit unless *a court* subsequently determines that the institution of the action was without probable cause.

There is a division of authority in other jurisdictions as to whether the existence of probable cause in a malicious prosecution action should be judged by a strictly objective standard or by a combination of an objective and a subjective standard. In other words, in addition to whether a reasonable attorney would have found probable cause to file the action, must the filing attorney also have had an honest belief that the cause of action was meritorious? *Compare, e.g.,* Sheldon Appel Co. v. Albert & Oliker, 765 P.2d 498 (Cal. 1989) (objective standard) *with*

---

[2]Even where the facts are disputed, the jury should be given the opportunity to find the facts, after which the court makes the legal determination of probable cause.

Bradshaw v. State Farm Mut. Auto. Ins., 758 P.2d 1313 (Ariz. 1988) (subjective and objective standard). *See generally* Dan B. Dobbs, *Belief and Doubt in Malicious Prosecution and Libel*, 21 Ariz. L. Rev. 607 (1979). It appears that the result in this case would have been the same regardless of which standard was used, since there is no evidence in the record that the subjective standard is not met, i.e., that Dutt lacked an honest belief that his cause of action was meritorious. However, the standard affects the evidence required and allowed to be presented. Therefore, this court must decide which standard applies.

Clearly, there is a societal interest in providing an opportunity for peaceable redress for people who believe they have been wronged. However, society also has an interest in protecting people from unjustifiable and unreasonable litigation. That is the policy behind the tort of malicious prosecution. Attorneys have the role of facilitating access to our judicial system. Attorneys are charged with what may appear to be conflicting ethical obligations—not to file unwarranted suits and to represent their clients' interests diligently. In Wong v. Tabor, 422 N.E.2d 1279, 1286 (Ind. Ct. App. 1981), the court described these considerations as follows:

> While an attorney is under an ethical duty to avoid suit where its only purpose is to harass or injure, if a balance must be struck between the desire of an adversary to be free from unwarranted accusations and the need of the client for undivided loyalty, the client's interests must be paramount. . . . [T]he very nature of our adversary system of law mandates that the most useful and meaningful tests in this area must be derived from an attorney's ethical and professional obligations to his client. . . .
>
> We thus emphasize that any standard of probable cause must insure that the attorney's duty to his client to present his case vigorously in a manner as favorable to the client as the rules of law and professional ethics will permit is preserved.

(Citations omitted.)

We conclude that the objective test set forth by the California Supreme Court in *Sheldon Appel Co.,* is most appropriate to maintain the balance between these interests. Under this test, the court must determine whether, on the basis of the facts known to the attorney, a reasonable attorney would have believed that the institution of the prior action was legally tenable. *Sheldon Appel Co.,* 765 P.2d at 511. The standard is objective rather than

subjective. The degree of expertise and the belief of the attorney are not relevant.

This court may determine whether Dutt had probable cause for filing the malpractice action in this case since the material facts were fully developed at trial and are essentially undisputed. *See* Nyberg v. Kirby, 65 Nev. 42, 67-68, 188 P.2d 1006, 1018 (1948), *see also* Pink v. Busch, 100 Nev. 684, 691, 691 P.2d 456, 461 (1984).

Dutt had information from Rentnelli's medical records, the description of events by Rentnelli and his son, John, and medical literature on meningitis and hydrocephalus. Judging Dutt's filing of the malpractice action under the objective standard, we conclude that a reasonable attorney would have believed that the action against the Reno doctors was legally tenable. The very fact that Rentnelli's condition continued to deteriorate after treatment by the Reno doctors but immediately improved after the Santa Barbara doctors' treatment would lead a reasonable person to believe that the first doctors did not adequately treat Rentnelli's ailments. A Santa Barbara doctor even told John that Rentnelli would have died if he had not brought Rentnelli in to them when he did. Dutt had no reason to believe that any of this information was unreliable. In fact, the medical records corroborated his client's statement of events.

There is no absolute requirement that an attorney obtain an expert medical opinion before filing a malpractice lawsuit. *See* Badell v. Beeks, 765 P.2d 126, 129 (Idaho 1988). Whether enough information exists for a reasonable attorney to file a malpractice suit remains discretionary. In some situations the facts related by the patient may provide a sufficient basis to file suit, such as where a doctor amputates the wrong leg. In other situations, where the medical situation is more complex, more extensive research may be required, including consultation with medical experts. In the instant case, we hold that a reasonable attorney would have believed that he or she had sufficient information to justify filing a malpractice action.

It has never been the law that every piece of evidence necessary to prevail at trial must be available to the attorney before suit is filed. That is one of the functions of discovery.

The objectively reasonable standard set out above already applies in a malpractice suit against a physician. Physicians

routinely make diagnoses and provide treatment based on the initial information given by the patient, even while planning further tests. When the doctor obtains additional information a different treatment may be indicated, but no one would suggest that taking preliminary action on the basis of the initial examination and history constitutes malpractice. Each professional may take objectively reasonable actions on the basis of information available at the time.

Just as an action for malicious prosecution will lie where a person commences an action without an objectively reasonable basis, an action will also lie where a person wrongfully continues a civil proceeding without probable cause. Nelson v. Miller, 607 P.2d 438, 433 (Kan. 1980). This theory was presented to the jury below, and respondents contend that the jury's verdict can be sustained on this basis. We disagree. The evidence adduced below does not support a finding against Dutt on this theory. Dutt received the Medical Quality Foundation's report on September 16, 1986, and he prepared a stipulation for dismissal the very next day. Moreover, after receiving the report, Dutt neither initiated further proceedings in the case nor conveyed any formal settlement demands to respondents. In our view, this evidence conclusively shows that Dutt discontinued the proceedings once he learned that a medical expert concluded that the delay in treatment did not cause significant damage, and that there was no probable negligence apparent from the medical records.

Since we have determined that Dutt had probable cause to file a complaint, no further inquiry is required as to the other elements of an action for malicious prosecution.

*Abuse of Process*

At the close of trial, Dutt moved for a directed verdict and for judgment notwithstanding the verdict or, in the alternative, for a new trial on the grounds that there was no evidence to support a verdict in favor of the physicians on their abuse of process claim. The trial court denied these motions, and Dutt contends that this was error. We agree.

An abuse of process claim consists of two elements: (1) an ulterior purpose other than resolving a legal dispute, and (2) a willful act in the use of process not proper in the regular conduct of the proceeding. Kovacs v. Acosta, 106 Nev. 57, 59, 787 P.2d 368, 369 (1990). An "ulterior purpose" includes any "improper motive" underlying the issuance of legal process. *See* Laxalt v.

McClatchy, 622 F. Supp. 737, 751 (D. Nev. 1985). At trial, the physicians assigned two improper motives to appellant Dutt.

The physicians first argued that Dutt and Rentnelli filed the malpractice action in an effort to avoid paying the bill for medical services provided by respondents. Even if Rentnelli was motivated by a desire not to pay respondents, Dutt clearly was not. Nothing in the record supports such a claim where Dutt is concerned.

Second, the physicians asserted that Dutt filed the malpractice action to coerce a nuisance settlement. According to the physicians, this improper motive was demonstrated by Dutt's attempt to negotiate a settlement with the lawyer for one of the respondents after he had obtained the Medical Quality Foundation's report. The record does not support a finding of such improper motive. While the physicians attempted to analyze *Bull v. McCuskey*, 96 Nev. 706, 615 P.2d 957 (1980), this case is readily distinguishable. In *Bull,* a jury award for a doctor in an abuse of process suit was supported by substantial evidence that the attorney filed a medical malpractice suit for the ulterior purpose of coercing a nuisance settlement. The attorney examined no medical records, conferred with no one, and then offered to settle the case for $750. *Id.* at 708, 615 P.2d at 959. This court held that this evidence was sufficient to sustain the verdict for abuse of process against the attorney. *Id.* at 709, 615 P.2d at 960. Unlike the defendant attorney in *Bull,* Dutt examined all the medical records, consulted medical and legal authorities, made no formal demand for settlement, and dismissed the complaint shortly after receiving the Medical Quality Foundation's report. Thus, we conclude that there is insufficient evidence to support a finding that appellant filed the malpractice action to coerce a nuisance settlement.

There is no evidence that appellant Dutt harbored an ulterior motive; because he was apparently merely attempting to resolve Rentnelli's apparent malpractice dispute with respondents, we need not consider the second element of an abuse of process claim, namely, whether appellant engaged in a willful act in the use of process not proper in the regular conduct of the proceeding.

## CONCLUSION

For the reasons set forth above, we reverse the judgment entered below, and we remand this case to the district court for entry of judgment in favor of the appellant. Our decision renders the physicians' cross-appeal moot.

SPRINGER and YOUNG, JJ., concur.

STEFFEN, C. J., with whom ROSE, J., agrees, dissenting:

In this court's opinion in Dutt v. Kremp, 109 Nev. 397, 848 P.2d 1073 (1993), we granted rehearing and ordered that the original opinion issued on December 22, 1992 (Dutt v. Kremp, 108 Nev. 1076, 844 P.2d 786 (1992)) (Dutt I) be withdrawn. The majority opinion issued today again reverses the judgment entered pursuant to jury verdicts in the district court. I remain convinced that the record provides substantial evidence to support the factual findings by the jury and sound legal support for the district court's post-trial rulings denying Dutt relief from the judgment entered pursuant to the jury's verdicts favoring the respondent physicians. I am therefore again forced to dissent. In large measure, the dissent set forth herein constitutes a restatement of my earlier dissent in *Dutt I.*

If we were reviewing a judgment against a member of the medical profession for medical malpractice on equivalent facts, there is little doubt that the judgment would be upheld. Consider the hypothetical physician who, after listening to the complaints of a patient, reaches a diagnosis in an area outside his or her area of expertise without even performing a meaningful medical evaluation. Moreover, the hypothetical physician disdains a consultation, forging ahead on the basis of an unconfirmed diagnosis derived almost entirely from the verbalized complaints of the patient. Finally, the uninformed physician performs unnecessary and unsuccessful surgery. Accountability for medical malpractice under those circumstances would be both predictable and justified.

In the instant case, attorney Dutt filed a thoroughly inadequate complaint against numerous doctors and a hospital two days before the effective date of a statute that would have required Dutt to file a complaint with a medical-legal screening panel.[1] The purpose for which the screening panel procedure was enacted is to discourage or minimize the filing of medical malpractice actions that are lacking in merit. The benefits of such a screening procedure are obvious: lower medical malpractice insurance rates (insurance costs are always passed on to the patients), less diversion of limited medical resources to defend against unwarranted litigation, enlightenment to attorneys inexperienced in complex medical malpractice cases, and a decreased toll on physicians and their reputations that would otherwise result from unmeritorious malpractice actions, to name but a few. According to attorney Dutt, the instant action was the first time he had ever filed a civil complaint for medical malpractice.

The majority concludes that a reasonable attorney "would have

---

[1]Dutt was not faced with a statute of limitations problem at the time he filed Rentnelli's complaint.

thought that the action against the Reno doctors was legally tenable'' based upon the following factors: (1) Dutt had information from Rentnelli's medical records; (2) the description of events by Rentnelli and his son; and (3) medical literature on meningitis and hydrocephalus. Moreover, after reaching the conclusion that a reasonable attorney would have endorsed the sufficiency of the meager efforts itemized above, the majority added two additional observations: (1) that Rentnelli's condition continued to deteriorate after treatment by the Reno doctors and improved after treatment in Santa Barbara; and (2) the Rentnelli's son was informed by "the Santa Barbara doctor" that "his father would have died if he had not brought him in to them when he did."

The foregoing factors constitute the sum and substance of the majority's conclusion supporting a reasonable attorney's belief that a malpractice action was "legally tenable." I suggest that both the medical and legal professions have much to fear if the majority's evaluation continues to prevail. I also suggest that the foregoing recital of what the majority finds adequate under an objective standard is woefully inadequate under any standard. This was Dutt's first venture into the complex world of medical malpractice. Medical records and treatises left unanalyzed by medical professionals are of little value to persons untrained in medicine or attorneys who have not developed either an expertise in medical malpractice, or paid the price to fully inform themselves of the proper requisites for handling such a complex area of the law. To conclude, as the majority obviously does, that a tyro in medical malpractice litigation can translate highly technical medical records and treatises into a reasoned determination of malpractice without even consulting a knowledgeable health care provider, let alone the physician who provided later care to the patient/client and who allegedly had knowledge of professional negligence by the treating physicians, is worrisome to the extreme.

Remembering that a jury heard the evidence and observed the witnesses, it is revealing to outline a number of the operative facts which, I submit, strongly support the verdicts reached by the jury. Relevant factors include: (1) prior to filing the complaint, the inexperienced Dutt assigned a law school graduate who worked for him to read the medical records and evaluate them with him; (2) Dutt relied on the law school graduate's "opinions and recommendations as to what was in the [medical] records and how to interpret them;" (3) Dutt contacted no physicians or medical experts of any kind prior to filing the complaint; (4) Dutt did not even bother to contact the physicians who succeeded the respondent physicians in caring for his client; (5) at no time prior to filing the complaint did Dutt have any health

care provider or physician review the medical records to determine whether a cause of action for medical malpractice existed; (6) after receiving a letter from Dr. Johnson, one of the physicians sued by Dutt, the latter responded to Dr. Johnson's attorney that the physician's letter "caused him to look at the case much more critically;" (7) almost nine months after Dutt filed his complaint against the Reno physicians, The Medical Quality Foundation ("Foundation"), with whom Dutt had at last corresponded in order to obtain a professional, medical evaluation of Rentnelli's treatment by the Reno physicians, informed Dutt that with respect to Rentnelli's condition, "[o]nce diagnosis is reached based on clinical features and laboratory studies, treatment is instituted at the earliest convenience, since without treatment an invariably fatal outcome occurs within 4 to 8 weeks of the onset." Continuing with its lengthy analysis, the Foundation concluded "[a]fter thorough review and research we can find no provable negligence in this case[;]" (8) On November 17, 1986, Dutt wrote to Dr. Johnson's attorney, observing in part:

[Y]ou stated that Dr. Johnson is very upset. I can understand his feelings. Determining that the problem was tuberculosis related clearly *was brilliant*.

Our problem was the failure to relieve the pressure within the skull. It now seems apparent that the pressure could have remained for an indefinite period of time without serious damage and that a shunt was only a matter of personal preference. *The fact that Mr. Rentnelli was on the proper medicine was apparently the only important factor*.

We now have Dr. Domz' deposition and clearly no reason exists for delaying the inevitable. *It is very clear that I would be unable to carry the burden of the proof* and therefore request dismissal of this matter.

(emphasis added); (9) Rentnelli did not keep his follow-up appointments with the Reno physicians; (10) Dutt irresponsibly denied a request to admit that he had no expert witness "known or believed to be willing to testify under oath as a physician that the [Reno physicians] had breached the standard of care;" (11) in an answer to an interrogatory, Dutt identified Santa Barbara physician Dr. Domz "as a witness who would state that the CT Scans in Reno were not properly interpreted;" (12) two months after Dutt had received the Foundation report indicating no provable negligence, and even as he praised the Reno physicians' diagnosis as "brilliant," Dutt explained to Dr. Johnson's counsel that he had told attorney Osborne, who also represented certain of the defendants in the medical malpractice action, that he, Dutt, would not dismiss the action "until after the depositions came back in the event that Dr. Domz did suggest that the treatment did

not meet the standard of care that one should expect from this area;'' (13) Dutt, having stated in the answer to interrogatory referred to above that Dr. Domz would, as a witness, testify that the CT Scans taken in Reno were not interpreted properly, did not even bother to appear in California at the taking of his ''witness''' deposition; (14) at no time did Dutt even speak to Dr. Domz, the Santa Barbara physician upon whom Dutt was allegedly going to rely for proving his case of medical negligence on the part of the Reno physicians; (15) Dr. Domz, in fact, found no fault with the treatment provided by the Reno physicians, a fact which prompted Dutt to admit in his letter of November 17, 1986, to attorney Pagni that ''[w]e now have Dr. Domz' deposition *and clearly no reason exists for delaying the inevitable*'' (emphasis added); (16) it was clear that by forcing counsel for the Reno physicians to depose Dr. Domz, Dutt ''hoped'' that the Santa Barbara physician might say something, anything, that might provide a liability peg upon which to hang his hat, but his ''hope'' was not sufficiently strong to warrant the expenditure of his time and money to prepare for and attend the deposition of his critical ''witness;'' and (17) even after all of the foregoing factors and events, Dutt still attempted to exact a nuisance settlement out of attorney Osborne.

The majority tells us that despite all the aforementioned factors, attorney Dutt's efforts represented a basis for a reasonable attorney to believe that there was probable cause to file this action against the Reno physicians! Moreover, the majority notes that it is not always necessary to obtain the opinion of a medical expert before filing a complaint for medical malpractice. In support of the proposition, the majority cites Badell v. Beeks, 765 P.2d 126 (Idaho 1988), a case involving a dentist who had ruined a model's career by filing her teeth without the patient's permission. The result of the dentist's work, demonstrated by before and after photographs, aptly portrayed why he was sued. Most likely, a medical expert would also be unnecessary to prove negligence in situations where a surgeon leaves a sponge in a patient's abdomen or removes a wrong appendage. *See* NRS 41A.100. Incredibly, with respect to the underlying area of medical negligence in the instant case, the majority observes that ''[i]n other situations when the medical situation is more complex, more extensive research may be required, including consulting with medical experts. In the instant case, we find that a reasonable attorney would have believed that he or she had sufficient information to justify filing a malpractice action.''

In Nevada, the importance and necessity of expert medical testimony or applicable medical literature demonstrating negligence under the circumstances at issue, is provided by statute:

> Liability for personal injury or death is not imposed upon any provider of medical care based on alleged negligence in the performance of that care unless evidence consisting of expert medical testimony, material from recognized medical texts or treatises or the regulations of the licensed medical facility wherein the alleged negligence occurred is presented to demonstrate the alleged deviation from the accepted standard of care in the specific circumstances of the case and to prove causation of the alleged personal injury or death
> . . . .

NRS 41A.100.

In order to demonstrate that the medical malpractice action filed by Dutt was not as simple as the majority would have us believe, I am attaching as Appendix A to this dissent a copy of the lengthy evaluation belatedly sought and received by Dutt from the Foundation.[2] I suggest that even lay persons will understand, as did the jury in the instant case, that the Reno physicians provided Rentnelli with life-saving expertise and treatment, properly characterized even by Dutt as "brilliant," and that the requisites of diagnosis and treatment were so complex that no action should have been contemplated, let alone filed, without first obtaining a thorough, professional medical analysis of the care provided by the Reno physicians. Unfortunately, their efforts were rewarded by the trauma and embarrassment of an ill-advised, precipitous and decidedly unenlightened lawsuit.

In assessing the majority's opinion that the malpractice action brought by Dutt against the Reno physicians was so simple that more extensive research and consultation with medical experts was unnecessary, I invite all interested persons to read the exhibit in the Appendix to this dissent. The readers should then ask themselves whether any person untrained in medicine could have reached a reasoned conclusion concerning the issue of malpractice without the assistance of someone with medical expertise. Indeed, Rentnelli's condition was so complex and difficult to diagnose, that additional specialized expertise had to be added to the medical team that cared for him and assisted with the diagnosis.

I also find it doubly troubling that Rentnelli's Reno physicians,

---

[2]Ordinarily I would refrain from attaching the type of confidential report submitted by the Foundation to either an opinion by the court or a dissent. In this case, however, there was no other practical method of demonstrating the absurdity of the majority's conclusion that the medical aspects of Rentnelli's treatment were sufficiently simple to validate the minimal efforts expended by attorney Dutt in determining that there was probable cause for filing the complaint against the respondent physicians. Of course, the Foundation report is part of the public record in this case and is no longer confidential.

who were demonstrably vigilant and effective in their treatment and care of Dutt's client, were not only subjected to an unwarranted lawsuit, but were further demeaned at trial by Dutt's flippant and contradictory testimony ascribing the physicians' successful and difficult diagnosis to luck.

On these facts, it is little wonder that the respondent physicians insisted on having their efforts and their reputations vindicated in a trial against their uninformed, precipitant tormentor, attorney Dutt. I suggest that there is also little cause to wonder why the jury provided the respondent physicians with the vindication they sought from the civil justice system.

If society is to have any confidence in the legal system and the administration of justice within our courts, there must be an accountability for derelict lawyers that is equal to the level of accountability we impose on derelict physicians and other professionals. As I view this record, the evidence strongly supports the jury's findings against Dutt. Plainly stated, the jury, by its verdict, announced that lawyers are not privileged to assail the reputation of physicians in court and subject them to the enervating trauma, time and cost of a lawsuit with its concomitant attenuation of professional standing without reasonable cause.[3]

Turning now to certain aspects of the majority's legal analysis, I note first my disagreement with the majority's conclusions regarding probable cause and the role it played in this case. The majority endorses for adoption in Nevada the probable cause rule announced in Sheldon Appel Co. v. Albert & Oliker, 765 P.2d 498 (Cal. 1989). With due respect to the California Supreme Court, I do not find its reasoning either sound or persuasive on the point. In adopting an "objectively tenable" standard for

---

[3]I certainly intend no disrespect for attorney Dutt concerning his general competence and the manner in which he may customarily handle legal matters other than the action involved in the instant case. I am simply unable to avoid the specific facts of Dutt's handling of the underlying medical malpractice action in explaining the basis for my dissent. Moreover, attorney Dutt and others may, by this dissent, be in a position to empathize with the respondent physicians whose efforts were characterized in part by Mr. Dutt in his complaint as follows:

> The physicians named in this complaint were under a duty to care and provide for the Plaintiff. They did not so provide adequately for the Plaintiff. The Plaintiff was discharged from Saint Mary's Hospital in practically the same condition as he was upon admission.
> That due to the Defendants' negligence the Plaintiff *almost died* and there *is no doubt* he would of if a shunt had not been placed in his head to relieve the high cranial pressure by Santa Barbara Cottage Hospital.

(Emphasis added.) I note, parenthetically, as a minor but perhaps telling point concerning the extent of the effort reflected by the complaint against the respondent physicians, that a "hospital" is hardly capable of any animation, including the placement of a shunt in a patient.

determining probable cause, the *Sheldon Appel Co.* court concluded that "the adequacy of an attorney's research is not relevant to the probable cause determination." *Id.* at 510. In so ruling, the California court disapproved dictum in Tool Research & Engineering Corp. v. Henigson, 120 Cal. Rptr. 291 (Ct. App. 1975), to the effect that "an attorney's reasonable investigation and industrious search of legal authority is an essential component of probable cause." *Id.* at 509.

It appears to me that the *Sheldon Appel Co.* rule is in essence a rule of happenstance. In other words, if, in evaluating the issue of probable cause, a court concludes that the action was objectively tenable when filed, then there is a proper basis for finding probable cause for filing the action despite a provable condition of complete ignorance on the part of the plaintiff's attorney regarding the merits of the action when the complaint was filed. I am of the opinion that the "objectively tenable" rule adopted in *Sheldon Appel Co.* tends to reward indolence, ignorance, indifference or exploitiveness by focusing on the ability of the defendant attorney and his counsel to produce, *after the fact,* a semblance of objective tenability that would satisfy the probable cause standard of the California court. This is a backward-looking rule that seeks to find and interject a rational basis for filing an action when an objective analysis of the conditions surrounding the action at the time it was filed would reveal none.

I am persuaded that the rule embraced by the Supreme Court of Arizona in Bradshaw v. State Farm Mut. Auto. Ins., 758 P.2d 1313 (Ariz. 1988), is more appropriate. Holding that the test for probable cause is both subjective and objective, the *Bradshaw* court stated that "[t]he initiator of the action must honestly *believe* in its possible merits; and, in light of the facts, that *belief must be objectively reasonable*." *Id.* at 1319 (citing Haswell v. Liberty Mutual Insurance Co., 557 S.W.2d 628, 633 (Mo. 1977); Restatement (Second) of Torts § 675 cmt. c (1977); *Prosser & Keeton on the Law of Torts* § 120, at 893 (5th ed. 1984)) (emphasis in original text).

Under the *Bradshaw* view, an inexperienced attorney's failure to research, consult, interview and meaningfully prepare before filing a complaint would be relevant in determining whether the attorney could have entertained an honest belief in the possible merits of his or her client's cause of action. Moreover, the second prong of the *Bradshaw* test requires that the attorney's honest belief be objectively reasonable. The latter test thus becomes a form of validation of the former. Assuming the attorney has a modicum of legal ability that has been adequately focused on meaningful research and evaluation, it is logical to expect that the attorney's honest belief regarding the merits of the client's cause

of action will be endowed with an aspect of objective reasonability.[4]

Moreover, at least in the more esoteric and complex areas of litigation, such as most instances of alleged medical malpractice, I disagree with both the majority and the *Sheldon Appel Co.* court in concluding that an attorney is entitled to rely entirely on what the client has said in determining whether there is probable cause to file an action. A client may, without any knowledge of the adequacy of his or her medical treatment, tell the attorney that the physician negligently treated him, describing the basis for his or her opinion. An attorney inexperienced in medical malpractice litigation may be as ignorant as the client with respect to the quality of the medical services actually provided by the client's physician. Under the view espoused by the majority, the uninformed attorney need not look beyond the client's perspective in determining whether there is probable cause to file a lawsuit. I believe such a view denigrates both the legal profession and the lawyers within the profession who are expected to apply enlightened understanding and analysis to a client's problems and concerns. *See* Nelson v. Miller, 607 P.2d 438, 448 (Kan. 1980).

If a client describes a simple battery to his or her attorney, it could be argued that the attorney may have probable cause to file an action against the alleged tortfeasor on the basis of what appears to be an honest factual recital by the client. In such a case, it is at least arguable that the rule adopted by the majority might be justified. In most medical malpractice cases, however, research and diligent inquiry and preparation are essential to an honest conclusion that probable cause exists for the filing of a complaint. I therefore take issue with the blanket rule adopted by the majority in the instant case.[5]

I fully agree with both the *Sheldon Appel Co.* and *Bradshaw* courts that when the operative facts are not in dispute, the issue of

---

[4]I note, as did the *Bradshaw* court with regard to the Arizona rule, that the subjective-objective test is consonant with NRCP 11, which forbids the filing of groundless actions by requiring an attorney to certify, by his or her signature, that

> he or she has read the pleading . . . [and] that to the best of his or her knowledge, information and belief, *formed after reasonable inquiry under the circumstances obtaining at the time of the signature, that it is well grounded in fact and is warranted by existing law . . . and that it is not interposed for any improper purpose.*

[5]NRS 41A.016 now requires all medical malpractice complaints to be filed in the first instance with a screening panel for a determination on the merits. The complaint so filed must contain a clear and concise statement of the facts and other circumstances relevant to the alleged malpractice. As a salutary consequence, the prospects for recurring actions of the type presented by the instant case should be minimized.

probable cause is an issue of law to be decided by the court. I also agree with the *Bradshaw* ruling that when the operative facts are in dispute, the trial court may, by special verdict form or by a hypothetical jury instruction, provide guidance to the jury as to what facts will constitute probable cause. *Bradshaw,* 758 P.2d at 1321.

The operative facts in this case are not in dispute and the district court should have ruled on the issue of probable cause as a matter of law. Based upon my review of the record, however, I must agree with respondents that the district court impliedly ruled in their favor on the issue of probable cause. The issue was fully discussed by the parties at trial, and the trial judge refused to grant an NRCP 41(b) motion to dismiss at the conclusion of plaintiffs' case, ruling that plaintiffs had "made out a prima facie case." The trial judge also rejected Dutt's motion for a directed verdict at the conclusion of the evidence. In any event, my review of the record leads me to conclude, contrary to the majority's determination, that as a matter of law, Dutt did not have probable cause to file the lawsuit even under the *Sheldon Appel Co.* standard. I have previously recounted the numerous derelictions surrounding the filing of the complaint and will only observe here that if, as the majority concludes, there was probable cause for Dutt's lawsuit, there would appear to be little basis for ever holding attorneys legally accountable for the filing of frivolous medical malpractice claims.

Needless to say, I also disagree with the majority's ruling on the issue of malice. A jury may infer malice from an absence of probable cause, *Nelson,* 607 P.2d at 445, and as previously observed, I find ample evidence in the record undermining the majority's recognition of probable cause. Moreover, I again emphasize that in my view, there is no basis for concluding that Dutt's pre-filing behavior and preparation were reasonable. In any event, the record as I read it provides ample support for the jury's finding of malice.

I suggest that the record also provides a factual basis for liability resulting from abuse of process. Dutt's attempt to secure a settlement after he was thoroughly disabused of the possibility of negligence on the part of respondents is discounted by the majority because the settlement attempt was unadorned by a "formal demand." I am unable to discern in the majority's characterization of the evidence any basis for casting aside the jury's verdict. Moreover, I find entirely unpersuasive the majority's attempt to distinguish the instant case from that of Bull v. McCuskey, 96 Nev. 706, 615 P.2d 957 (1980). In *Bull,* this court affirmed an award against the attorney who filed a medical malpractice action based upon a determination that substantial evidence in the record supported the finding that the action was filed

for the ulterior purpose of coercing a nuisance settlement. By way of contrast, the majority concludes that Dutt's (uninformed) examination of "all the medical records," and his after-the-fact, belated consultation with medical and legal authorities, coupled with a lack of "formal" settlement demand, eventuating in the dismissal of the complaint, justified Dutt's traumatizing efforts against the respondent physicians. I disagree and so did the jury who heard the evidence.[6]

For the reasons abbreviated above, I would endorse the jury's verdict and affirm the judgment entered pursuant thereto. I therefore respectfully dissent.[7]

---

[6]Interestingly, in *Bull,* this court concluded that Bull's "offer to settle the case for the minimal sum of $750 when considered in the light of his failure adequately to investigate before deciding to file suit and the total absence of essential expert evidence, supports such a conclusion by the jury, and we may not set it aside." 96 Nev. at 709, 615 P.2d at 960. In *Bull,* we also noted that "[b]efore filing suit, attorney Bull did not examine nor did he obtain medical records from St. Mary's Hospital or Physicians' Hospital. He did not confer with a doctor. Neither did he submit his client's claim to the Joint Screening Panel . . . . After filing suit, attorney Bull did not secure the deposition of Dr. McCuskey [the treating physician], nor of any doctor. He did not retain an expert for trial, nor attempt to do so." *Id.* at 708, 615 P.2d at 959.

Note the remarkable similarity between *Bull* and the instant case. Although attorney Bull did not obtain or examine the medical records, I suggest that Dutt's "examination" of the medical records was the practical equivalent of no examination at all. To prove my point, I dare say that most members of this court, as well as attorneys who, as Dutt, have had no experience in medicine or medical malpractice matters, could not make "heads or tails" of the evaluative report from the Foundation with the exception of its conclusion that the Foundation could find no provable negligence in the case. Moreover, note that Dutt duplicated Bull's lack of effort in failing to consult with any doctor, including the treating physicians, or in taking his client's "claim" to the medical-legal screening panel prior to filing suit. Moreover, after filing suit, Dutt also took no depositions, although he forced the respondent physicians to take the deposition of a California doctor by misleading representations indicating that the California physician would provide evidence of negligence.

[7]This dissent does not fully track the majority opinion issued in this matter. I have determined that this court's resolution of this appeal should not be further delayed and have therefore determined not to again revise my dissent. In any event, I am of the view that the material covered by this dissent needs to be preserved as written.

# APPENDIX A

Established 1976

Jerry Jacobs, M.D., Medical Director
Diplomate of the American Board of Surgery
Diplomate of the National Board of Medical Examiner

**The Medical Quality Foundation**
The American Board of Medical-Legal Consultants
National Headquarters
104 Elden Street
Herndon, Virginia 22070
TOLL FREE: 800-336-0332
In Virginia and D.C.: (703) 437-3333

*CONFIDENTIAL*
*This attorney work product report
is not intended for discovery.*

September 11, 1986

Mr. Virgil D. Dutt
350 South Center Street
Suite 250
Reno, Nevada   89501

Re: Jack Rentnelli

Dear Mr. Dutt:

We are in receipt of your firm's check and medical records of Jack Rentnelli from St. Mary's Hospital and Santa Barbara Cottage Hospital.

As you know, I am a Board-Certified surgeon, fully experienced in the diagnosis and treatment of patients with problems similar to those in this case.

Over the past ten years we have reviewed more than twelve thousand medical files to issue opinions regarding malpractice.

Associate Director Kevin S. Billings and I have reviewed the records of Jack Rentnelli and have prepared the following confidential Work Product Report for you.

Jack Rentnelli, a 63 year old white male, was admitted to St. Mary's Hospital on February 19, 1985 with a 2 week history of headache and a change in personality. The headaches were described as occurring daily, continuously, and generalized with no directly associated symptons. The patient apparently had "some change in personality, clumsiness, forgetfulness and some speech problems." He was taking one medication at that time for high blood pressure.

Physical examination on admission was essentially normal with the exception of mildly abnormal cerebellar function (eye-hand coordination). Neurological consultation obtained on the day following admission stated an impression of "meningitis, exact type unknown."

It is noted later that under family history the patient stated that his father was deceased due to tuberculosis. On admission a spinal tap was performed and although pressure readings of the fluid in the spinal column are normally obtained, on that occasion an exact reading was not taken, but "there was no

obvious increased pressure in the fluid." Spinal fluid analysis demonstrated an abnormally elevated number of white blood cells and protein as well as a decrease in the glucose concentration, all of which are consistent with laboratory findings for tuberculous meningitis. Computerized tomography scan, a computer directed and enhanced x-ray study, revealed enlargement of the spinal fluid filled compartments of the brain, possibly due to "normal pressure hydrocephalus."

On February 22, 1985 a second lumbar puncture (spinal tap) was performed and again an "opening pressure was not obtained due to patient movement." Laboratory analysis of the cerebrospinal fluid sample revealed similar findings to the study done 3 days prior. Chest x-ray revealed "paratracheal node calcifications." An infectious disease consultation referred to the x-rays in stating that: "Because of the chest calcifications, I agree that this body may have seen the tuberculous organism in the past and certainly, his cerebrospinal fluid (CSF) examination could be consistent with an active case of tuberculous meningitis."

Based on the clinical and laboratory findings the patient was started on a regimen of antituberculosis drugs on February 25, 1985. During Mr. Rentnelli's hospital stay he experienced electrolyte imbalances. Electrolytes are chemicals in the blood stream which are necessary for cellular function and metabolism. The chemicals must stay within a specific range or complications will result. Through oral and intravenous fluid therapy the patient's electrolytes were manipulated in an attempt to achieve normal levels.

Over the course of the patient's 2 week hospital stay, "He underwent a slow but progressive improvement in his overall status." Although he was noted to be quite independent at the time of discharge, there was still some confusion which necessitated someone to care for him 24 hours a day. The patient was discharged on March 3, 1985 with a plan for follow up and on antituberculosis medications.

On March 13, 1985 Mr. Rentnelli was admitted to Santa Barbara Cottage Hospital with the chief complaint of headache and mental obtundation. The reason for the admission primarily was "because of the unrelenting nature of the patient's headache and relative lack of evidence that the patient is recovering any of his mental acuity." Recent medical history and physical examination findings were unchanged since the previous hospitalization. The initial diagnosis was "acute meningioencephalitis, etiology to be determined." Two days after admission a lumbar puncture was performed and finally a cerebrospinal fluid opening pressure of 310 mm. of water was obtained. The record does not state the patient's position while the pressure readings were taken. This is significant because with the patient in the horizontal position the pressure varies from 80 to 200 mm. of water, yet in the sitting position readings of 280 mm. of water are not unlikely. During the spinal tap procedure 22 ml. of cerebrospinal fluid were removed for testing and subsequently the patient reported headache relief.

In the progress record, the entry dated March 18, 1985 states: "telephone report from lab at St. Mary's Hospital, Reno, this a.m.: spinal fluid cultures showed 3 colonies of acid fast bacilli. These will now be isolated (3 weeks) and sent to state lab and Center for Disease Control for confirmation."

Mycobacterium tuberculosis, the microbial which causes tuberculosis, is characterized as one of the agents that are acid fast.* Additionally, most disease causing Mycobacteria grow unusually slowly and, due to the small amount of spinal fluid cultured, are often difficult to isolate.

An infectious disease consultation obtained on March 18th made note of "persistently positive PPD." This refers to the purified protein derivative skin test which is strongly sensitive in the diagnosis of tuberculosis. The only reference to reading a PPD skin test is dated March 19, 1985 in the progress record and states: "shows only erythema (redness) 9 mm. with no induration (hardness)." This could be interpreted as a doubtful positive or possibly a 1+ positive. The department of pathology's assessment revealed a 0 to 5 mm. induration, which can be interpreted as negative.

Computerized tomography of the head revealed "findings indicative of a communicating hydrocephalus . . . whether there is normal pressure or not should be clinically considered." On March 22, 1985 the patient was taken to surgery for a biopsy of a mass and for insertion of a shunt, a valve designed to release cerebrospinal fluid in the event of increased intracranial pressure. The procedure was completed successfully using proper technique and the biopsy specimen was found to be benign. A CT scan completed 3 days after the procedure showed: "dilatation of the entire ventricular system persists and may be minimally improved." It is noted in the discharge summary that "postoperative the patient developed a right facial palsy which fluctuated in severity since its onset. Etiology is uncertain. It could be simply a coincidence or, result of the intracranial manipulation, or involvement of the seventh nerve by the tuberculous meningitis." Mr. Rentnelli's neurological status and headaches continued to improve until his discharge on March 30, 1985.

Clinical manifestations of tuberculous meningitis are usually headache, lethargy, confusion, fever associated with stiff neck and signs of raised intracranial pressure. Mr. Rentnelli clearly demonstrated these findings. From *Principles of Neurology,* copyright 1981, it states: "In most patients with tuberculous meningitis there is evidence of active tuberculosis elsewhere, usually in the lungs" and "In some patients only inactive pulmonary lesions are found." The patient had a predisposing family history of tuberculosis and suspicious x-ray findings in the lungs. Concerning the apparently negative purified protein derivative skin tests the above cited text cites "only 2 of the 35 patients had nonreactive tuberculin tests." Laboratory studies of cerebrospinal fluid in a case of tuberculous meningitis demonstrate an abnormally increased number of white blood cells, elevated protein levels and reduced levels of glucose. As previously mentioned, the patient perfectly conforms to the abnormal laboratory studies in tuberculosis. Although in the records there is suspicion of tubercular bacilli in the cultures, exact isolation of the specific organism is not necessary for the diagnosis and treatment. Once diagnosis is reached based on clinical features and laboratory studies, treatment is instituted at the earliest convenience, since without treatment an invariably fatal outcome occurs within 4 to 8 weeks of the onset.

In reference to the increased pressure of the cerebrospinal fluid, it was most likely due to normal pressure hydrocephalus which is a possible sequelae of

*a laboratory staining characteristic

tubercular meningitis. Upon contracting one of our expert neurosurgical consultants we found that it is within the standard of care to not evaluate cerebrospinal fluid pressure and it was felt that the one month period between the patient's initial admission and the eventual shunt placement would not produce significant brain damage.* The focus of importance in this case is the correct diagnosis and treatment of an organism which is elusive and difficult to isolate and culture. After thorough review and research we can find no provable negligence in this case.

Please find enclosed documentation of tuberculous meningitis, examination of cerebrospinal fluid, hydrocephalus and microbiological data on the infecting organism.

Every effort has been made to be as clear as possible regarding the issues in your case. This review and report have been limited to the documents and information you have provided.

Should you need further clarification relating to the content of this report, please feel free to contact Associate Director, Kevin S. Billings, or me.

It is our policy not to discuss the content of these reports with the plaintiffs involved.

This report is not intended for discovery, as it is a confidential Work Product Report prepared at your request. Kevin Billings and I are not available to serve as expert witnesses in this case. We have thousands of Board-Certified medical experts on our consulting staff who can review the records and will testify in support of their own opinions.

Thank you for allowing us to assist you by reviewing this interesting case.

Sincerely yours,

H. Barry Jacobs, M.D.
Medical Director

Kevin S. Billings
Associate Director

HBJ/pbm

Enclosure

*if the hydrocephalus was severe, there would be coma and the brain damage would be more provable. With the meningitis diagnosed and treated, and considering his clinical condition, the care was proper.