EXECUTIVE MANAGEMENT, LTD., a California Corporation, Appellant, v. TICOR TITLE INSURANCE COMPANY, a Foreign Corporation; BARBARA MARKS, an Individual; the MANLEY MARKS and BARBARA MARKS 1988 TRUST, BARBARA MARKS, Trustee; MARKS PLAZA, a Nevada Corporation; PALMALL PROPERTIES, a Nevada Corporation; and ARTHUR SHIPKEY, an Individual, Respondents.

No. 27991

September 1, 1998                                        963 P.2d 465

*George R. Carter,* Las Vegas, for Appellant.

*Lionel Sawyer & Collins* and *David N. Frederick* and *Suvinder S. Ahluwalia,* Las Vegas; *Levinson & Liebermann* and *Peter M. Hebert,* Beverly Hills, California, for Respondent Ticor.

*Ralph J. Rohay,* Las Vegas, for Respondents Marks.

*Cohen, Johnson & Day* and *David Colvin,* Las Vegas, for Respondents Palmall and Shipkey.

## OPINION

*Per Curiam:*

Respondent Palmall Properties, Inc. (Palmall) sold several contiguous parcels of land to two different buyers in two separate transactions. Lot 1 was sold to respondents Barbara and Manley Marks (the Markses), and lots 2 and 3 were sold to appellant Executive Management, Ltd. (Executive). Respondent Ticor Title Insurance Co. (Ticor) served as escrow agent in both transactions. When the Markses' deed was first recorded, it erroneously contained a description of lots 1 *and* 2. The Executive deed was subsequently recorded describing lots 2 and 3. Shortly after both deeds were recorded, Ticor re-recorded the Markses' deed so as to remove lot 2 from that deed. Three years later, the Markses sued Executive to quiet title to lot 2 in their favor and sued Ticor and Palmall for, *inter alia,* negligence, breach of contract, and fraud in conveying lot 2 to both Executive and the Markses.

Executive then sued the Markses, Ticor, and Palmall, asserting various causes of action, also arising out of the sale of lots 1, 2, and 3. Executive's suit was eventually dismissed as being barred by the doctrine of res judicata with relation to the case first filed by the Markses. Executive appeals the judgment dismissing its complaint.

### FACTS

This matter arises out of two 1985 real estate transactions that culminated in a thirteen-day trial (hereinafter referred to as "case I"), which commenced on January 22, 1991, before District Judge J. Charles Thompson. The district court issued its findings of fact and conclusions of law on July 26, 1991, followed by a judgment on October 23, 1991. The judgment was subsequently appealed, cross-appealed, and argued before this court. We dismissed both the appeal and cross-appeal. Marks v. Executive Management, Ltd., Docket No. 22935 (Order Dismissing Appeal, March 25, 1993).

During the pendency of the case I trial, one of the defendants filed suit (hereinafter referred to as "case II") against the plaintiffs, and eventually added in most of its codefendants from case I. On September 11, 1995, District Court Judge Donald M. Mosley dismissed case II as being barred by the doctrine of res

judicata in relation to case I. The plaintiffs in case II now appeal that dismissal.

The primary parties in both cases I and II are: Palmall, Palmall's president and majority shareholder, Arthur H. Shipkey (Shipkey), Ticor, Executive, and the Markses.[1] Both cases arise out of the following facts, as documented by the parties and Judge Thompson in case I: Palmall owned several contiguous parcels (lots 1, 2, and 3) of undeveloped real estate off of Casino Drive in Laughlin, Nevada. In May of 1985, Palmall (through Shipkey) agreed to sell lots 2 and 3 to Executive for $1,200,000. Shipkey reserved an easement for ingress and egress over lot 2 for the benefit of lot 1. At approximately the same time, Palmall agreed to sell lot 1 to the Markses for $275,000.

In 1983, Shipkey had begun proceedings to subdivide the original lot 1 (300' x 120') into lots 1 (220' x 120') and 2 (80' x 120'); however, the parcelization map showing the subdivision of lot 1 was not recorded until October 25, 1985. In January of 1986, Palmall and the Markses closed escrow; however, the recorded deed contained a defective legal description, describing lot 1 as 300' x 120', rather than the post-subdivision description of 220' x 120'. Later that month, Palmall and Executive closed escrow, and that recorded deed contained the correct descriptions of lots 2 (80' x 120') and 3. Thus, by the end of January 1986, the records showed that both Executive and the Markses owned the same 80' x 120' parcel of land fronting Casino Drive.

Ticor served as escrow agent for both the Palmall/Marks and Palmall/Executive transactions. Ticor's title search prior to the close of the Markses' escrow did not uncover the subdivision map. Judge Thompson found that when the legal description of lot 1 was first submitted to Ticor, the description was 300' x 120'. The district court further found that Shipkey knew that this description was inaccurate, but he planned to provide a corrected legal description prior to the close of the Palmall/Marks escrow. Shipkey subsequently provided proper legal descriptions for lots 1 (220' x 120') and 2 (80' x 120') to a Ticor employee following recordation of the subdivision map, and prior to the close of the Palmall/Marks escrow. Shipkey delivered the corrected legal description to a Ticor employee on January 13, 1986, at the same time he delivered a quitclaim deed relating to the Palmall/Executive escrow. Judge Thompson noted that Shipkey had failed to "mark the documents or identify the escrows to which the property descriptions applied." The Ticor employee failed to place a copy of the subdivision map in Ticor's escrow file for the Palmall/Marks transaction.

[1]Prior to the filing of case I, the Markses assigned their interest in the real estate at issue to Casino Properties which then conveyed that interest to Marks Plaza. Accordingly, Marks Plaza also became a named party in both cases.

The Markses' deed describing lots 1 and 2 was recorded on January 17, 1986. Executive's deed describing lots 2 and 3 was not recorded until January 28, 1986. In February of 1986, Palmall informed Ticor that the legal description in the Markses' deed erroneously included the perimeters of lot 2. Without prior notice to Executive or the Markses, Ticor re-recorded the Palmall/Marks deed so as to describe the boundaries of the Markses' land—lot 1—as 220' x 120'.

Three years later, on January 4, 1989, the Markses filed suit (case I) against Executive, Palmall, Shipkey, and Ticor, alleging ownership of the 80' x 120' lot 2 included in the first recording of their deed. On March 15, 1989, the Markses filed a *lis pendens* against Executive's entire property (lots 2 and 3). The Markses' complaint against Executive sought to quiet title to lot 2 in their favor. The gravamen of the case I complaint was that Ticor had negligently or intentionally recorded conflicting documents and was, therefore, liable to the Markses under theories of negligence and breach of the escrow contract.

The case I complaint further alleged that Ticor had slandered the Markses' title and asserted that Ticor had conspired with Palmall/Shipkey to "intentionally and fraudulently convey[] the same property" to the Markses and Executive. The Markses also claimed that Ticor had breached its title insurance contract with them, breached its fiduciary duty, acted in bad faith, and violated its statutory obligations by failing to defend them in their attempt to acquire clear title to lot 2. The Markses' complaint also sought an injunction against a party attempting to foreclose on lot 2 by way of a deed of trust issued by Executive.

Upon being served in case I, Executive contacted a law firm, which in turn contacted Ticor. Ticor informed Executive that separate counsel would not be necessary, and agreed to defend Executive's title against the Markses without reservation of rights. Case I proceeded to trial with Ticor and Executive sharing the counsel of R. Gardner Jolley (Jolley). On the fourth day of the case I trial, February 21, 1991, Judge Thompson responded in chambers to a concern raised by Executive's president about a possible conflict of interest with Jolley's dual representation of Ticor and Executive; Judge Thompson offered to declare a mistrial to allow Executive to seek independent counsel.

During this in-chambers discussion, Judge Thompson noted: "It's quite possible that Executive Management has claims against Ticor. They have not pursued it here. . . . Whether it's a compulsory claim, I don't know." Executive chose to proceed with the trial of case I, but the day after this in-chambers discussion sent the following letter to Jolley, stating in pertinent part:

> Executive Management is fully aware that if Executive Management is not the prevailing party relating to the prop-

erty which is the subject matter of [case I], Executive Management may have potential claims against Ticor Title, along with the other defendants in the lawsuit. Additionally, the issue of a potential conflict in your office representing both Ticor Title and Executive Management has previously been discussed regarding the fact that there may be future potential litigation involving Ticor Title.

This letter is to confirm the telephone conversation . . . whereby Executive Management agreed to waive any potential conflict as it relates to your office representing both Executive Management as our attorneys and also Ticor Title in [case I], but solely on the condition that allowing your office to continue in [case I] shall not be considered a waiver of any rights that Executive Management may have under its title insurance policy against Ticor or other claims Executive Management may have against any other defendants in the action . . . .

That same day, Executive filed suit (case II) against the Markses to quiet title to lot 2 in its favor and for slandering its title to lot 2. Executive claimed that the Markses had knowingly misrepresented to others that they owned lot 2 and had maliciously filed a *lis pendens* against Executive's lots 2 and 3, thereby ''impair[ing] the vendibility'' of that property. Executive alleged damages in that the *lis pendens* filed against lots 2 and 3 had interfered with a multi-million dollar sale of that real estate to a third party who had planned to develop the property into a hotel/casino. Executive also attributed its failure to make payments on the deed of trust and, therefore, the impending foreclosure on lots 2 and 3, to its inability to sell the real estate with clouded title. The case I trial continued for eight more days; however, Judge Thompson did not issue any findings or conclusions until the end of July, 1991.

Meanwhile, on April 26, 1991, the Markses filed a counterclaim against Executive in case II, seeking to quiet title to lot 2 in their favor or, in the alternative, an easement in their favor over lot 2. The Markses also impleaded Ticor, Shipkey, and Palmall as third-party defendants reiterating their claims against these parties that were first raised in case I. On May 7, 1991, following the district court's preliminary finding that title should be quieted in favor of Executive, the Markses petitioned the district court to consolidate case II with the still pending case I.

Executive and Ticor opposed the consolidation motion, arguing that ''there [were] no common questions of law or fact between the two cases since the issue in [case I] was who got title to Parcel 2, while the issue in [case II] is whether or not the Markses are liable for wrongfully placing a lis pendens on Executive

Management's property . . . ." On June 24, 1991, Judge Thompson denied the Markses' motion to consolidate cases I and II.

On July 26, 1991, Judge Thompson issued his complete findings of fact and conclusions of law in case I. The district court referred to the testimony of Shipkey's real estate broker, Tom Patton. Patton stated that prior to the sale of lot 1 to the Markses, "he paced off approximately 80 feet of Parcel 2 in front of [the Markses], then paced off the 220 feet of Parcel 1, and told them that the sale would include Parcel 1 but not Parcel 2." Mrs. Marks denied walking the property with Patton.

The district court found that Mrs. Marks retained architectural engineer William Lobato to submit a development plan for a shopping center to the Clark County Planning Commission. Shipkey then submitted a zoning application on behalf of the Markses as an escrow condition. The district court noted that the Markses' zoning file contained legal descriptions of lots 1 and 2, in addition to Patton's handwritten note indicating that the application only covered lot 1.

The district court further noted that at least two months before closing, Mrs. Marks told Lobato that "the parcel she believed she was buying . . . had only 220 front feet." The district court referred to testimony that "disclosed Barbara Marks has extensive experience in dealing with real estate and real estate transactions concerning commercial property." Notwithstanding the evidence that Mrs. Marks knew that she was only purchasing lot 1 (220' x 120'), the district court found that Mrs. Marks became aware of the fact that Shipkey had provided Ticor with legal description of the land to be sold to the Markses which included lot 2, and Mrs. Marks "believed that she would receive Parcel 2 from Shipkey in the transaction."

The district court found that Palmall/Shipkey had intended to convey lot 1 (220' x 120') to the Markses, and lot 2 (80' x 120') to Executive, subject only to an easement for ingress and egress in favor of the Markses. Concluding that there had been no "meeting of the minds between the Marks and Shipkey" with regard to the conveyance of lot 2, the district court reformed the Palmall/Marks contract so that the Markses were entitled only to lot 1. Title to lot 2 (80' x 120') was quieted in Executive, subject to the Markses' easement.

Judge Thompson dismissed the Markses' action against Palmall/Shipkey because Ticor had "closed escrow on a parcel of property (Parcel 2) that had not been intended to be conveyed [by] Shipkey to Marks." Because the district court found that there was not a contract between the Markses and Palmall for the sale of lot 2, it concluded that there could be no damages. The court further

found that the Markses had failed to present "any competent evidence" of damages. With regard to the Markses' claims against Ticor, the district court found:

> Ticor was not in breach of contract to the Marks as to the title policy since its duty was only to insure the property sold by Palmall to the Marks. Since it is a finding of the Court that Palmall only intended to sell Parcel 1 to the Marks, the title policy only insured the sale of Parcel 1 to the Marks.
>
> . . . .
>
> *Although Ticor may have been negligent* in not attaching the correct property description to the . . . [Markses'] Deed . . . , the Court finds that *Ticor is not liable for its handling of the escrow because the [Markses] suffered no damages as a proximate result* thereof, since even if the correct legal description had been used, the Marks would have only received Parcel 1.[2]
>
> . . . .
>
> Ticor did not act intentionally, fraudulently, maliciously or in bad faith in the performance of this [sic] contractual and/or fiduciary duties, if any . . . .
>
> Ticor did not conspire with Palmall or any other person to record fraudulent deeds, slander title or otherwise to harm the Marks.

(Emphasis and footnote added.) The court also concluded that Ticor had not committed any unfair trade practices, and all of the Markses' claims against Ticor were dismissed with prejudice. The district court issued its final judgment in October 1991. The judgment did not expressly incorporate the findings of fact and conclusions of law; it simply quieted title of lot 2 in Executive's favor, subject to an easement, and dismissed the Markses' damages claims against all defendants.

Prior to this judgment in case I, on July 31, 1991, Executive amended its complaint in case II, adding claims against Palmall, Shipkey, and Ticor. A year later, on October 20, 1992, the district court once again granted Executive leave to amend its case II complaint. Executive withdrew its quiet title claim, but now charged Ticor, Palmall, and Shipkey with negligence, gross negligence, negligent misrepresentation, breach of fiduciary duty, constructive fraud, and breach of implied and express contract. Executive further asserted claims against Ticor for fraudulent concealment, bad faith, breach of the duty of good faith and fair dealing, statutory unfair practices, and malpractice. Executive added claims of negligence, gross negligence, negligent misrepresenta-

---

[2]The district court further concluded that "[a]ny additional claims of negligence would have had to been established by the introduction of expert testimony of which there was none."

tion, abuse of process, and intentional interference with contractual relations to its slander of title claim against the Markses.

In the amended complaint, Executive asserts that it did not discover Ticor's negligence in searching title records until the case I trial. Executive further asserted that following Shipkey's testimony in the case I trial, Executive learned that Shipkey had conspired with the Markses to record lot 2 in the Markses' deed; Executive argues that this was done so as to facilitate a zoning change sought by the Markses who were building a shopping center on the property purchased from Palmall.

By early 1993, Executive had changed counsel at least three times. On January 11, 1993, the discovery commissioner filed a report recommending dismissal of case II, citing Executive's failure to conduct an early case conference. Following a February 12, 1993 hearing on the issue of dismissal, Judge Mosley set aside the discovery commissioner's recommendation and allowed case II to proceed. Of particular note, Judge Mosley stated that this case was not a "typical . . . lack of prosecution case" and continued:

> I have never been reluctant to exercise the discretion afforded me under 41(e) and . . . I am very unsympathetic to failure to comply with discovery requirements.
>
> And I will say also as an aside that when I see four attorneys in a case [(referring to Executive's chain of counsel)], my eyebrows raise and that is just the way it is. But I think that the problems we have here were visited on this case primarily because we had so many attorneys and this [case I] situation rather clouded the issue here. We were waiting for a decision from the Supreme Court among other things. And it looks to me just to be a gallimaufry [sic] of mistakes or omissions largely because of the various attorneys, I imagine, in the other case. It is so complicated procedurally.
>
> I cannot escape from the conclusion that [the discovery commissioner's] recommendation in this case is overly harsh.
>
> . . . .

On January 13, 1995, Executive filed a motion for expedited trial setting; the motion was opposed by Palmall/Shipkey, and subsequently denied on February 7, 1995. A bench trial for case II was scheduled to commence January 2, 1996.

In March of 1995, Palmall/Shipkey filed a motion for summary judgment, arguing no genuine issue of material fact existed due to collateral estoppel and the lack of a fiduciary duty by Palmall/Shipkey to Executive. The Markses opposed Palmall/Shipkey's summary judgment motion, arguing that "SHIPKEY is the most culpable since his actions in selling a sin-

gle piece of property to two (2) separate parties created all the problems herein. . . . What has not been litigated in any manner is Executive Management's action against him.''

After noting that his law clerk had concluded that case II had been resolved in case I, Judge Mosley requested a motion to dismiss. The Markses filed a motion to dismiss in which Palmall/Shipkey joined. The Markses' motion was ''predicated on principles of res judicata—collateral estoppel, statute of limitations and substantive issues of law.''[3]

On July 25, 1995, Judge Mosley granted the motion to dismiss case II stating:

> I think I heard this earlier on, but I spoke to Judge Thompson and his recollection of this was that there was a full hearing of the issues or an opportunity given to fully hear the issues, and the parties he said elected to go forward.
>
> I cannot escape from the conclusion that if another trial is allowed, we are going to spend about two-thirds of the time that was spent in [case I] going over the identical issues, the facts, the whole scenario, and then we're going to put a little different twist on it at the end and pray for some additional rulings.
>
> And the result could well be that my ruling would be inconsistent with Judge Thompson's, and we would be expending another week or whatever it might be giving a rehearing of facts in the initial [case I] trial.
>
> Judicial economy or from an economy sense won't allow that to occur. I'm going to grant the motion to dismiss proffered by the defense.

On September 15, 1995, judgment issued dismissing case II as to all defendants. Executive appeals from this judgment arguing that dismissal was erroneous because the issues raised in case I did not have preclusive effect on those raised in case II, and because Judge Mosley relied on an out-of-court conversation with former District Judge Thompson in deciding to dismiss case II.[4]

## DISCUSSION

Ticor asserts that ''the district court dismissed this case based on a failure to prosecute, not on the merits,'' and that ''[t]he Court properly exercised its discretion to dismiss this action for

---

[3]In several sentences within the nine-page brief accompanying the motion to dismiss, the Markses erroneously cite ''NRCP 41(B)''—it should be NRCP 41(e)—noting that the court has the discretion to dismiss Executive's claim for failure to prosecute and that in February 1996, dismissal would become mandatory under the five-year rule.

[4]It appears that the Markses are no longer pursuing their counterclaims against any of the parties, and no cross-appeal has been filed.

failure to prosecute under N.R.C.P. 41(e) due to the chronic lack of diligence by Executive Management." Having reviewed the transcript of the district court's hearing on the motion to dismiss, we find no mention by the court of NRCP 41(e), Executive's failure to prosecute, or any chastisement for Executive's alleged "chronic lack of diligence." Ticor did urge the court to consider dismissal on 41(e) grounds; however, we conclude that passages throughout the transcript indicate that Judge Mosley's decision to dismiss was based upon his belief that the issues of case II were or could have been litigated in case I. Therefore, because we conclude that the facts do not indicate that dismissal was based upon NRCP 41(e), we will not affirm the dismissal on the ground that Executive failed to prosecute case II.

Judge Mosley asked the case II defendants to file a motion to dismiss after they had presented their motion for summary judgment; however, the circumstances reflect that the motion to dismiss led to a review of Executive's claims that went beyond the pleadings; Judge Mosley reviewed various affidavits and the transcript of case I. We have stated that "[w]hen a district court errs 'in failing to expressly consider respondent's motion as one for summary judgment,' this court is 'not obliged to reverse,' but 'simply review[s] the dismissal order as if it were a summary judgment.'" Schneider v. Continental Assurance Co., 110 Nev. 1270, 1271, 885 P.2d 572, 573 (1994) (alteration in original) (quoting Thompson v. City of North Las Vegas, 108 Nev. 435, 438-39, 833 P.2d 1132, 1134 (1992)).

We therefore construe the district court's judgment as granting summary judgment on the basis of res judicata under NRCP 56, and an order granting summary judgment is reviewed de novo. Tore, Ltd. v. Church, 105 Nev. 183, 185, 772 P.2d 1281, 1282 (1989). To resolve the case before us, we must now consider the application of two related, but separate areas of law—(1) the doctrine of res judicata, and (2) the law of compulsory and permissive counterclaims and cross-claims set forth in NRCP 13.

"Generally, the doctrine of res judicata precludes parties . . . from relitigating a cause of action or an issue which has been finally determined by a court . . . ." University of Nevada v. Tarkanian, 110 Nev. 581, 598, 879 P.2d 1180, 1191 (1994). We have recognized that "there are two different species of res judicata . . . issue preclusion and claim preclusion." Id. at 598, 879 P.2d at 1191. Although often used to describe both "species," in its strictest sense, the term "res judicata" refers only to claim preclusion. Pomeroy v. Waitkus, 517 P.2d 396, 399 (Colo. 1974).

Pursuant to the rule of claim preclusion, "[a] valid and final judgment on a claim precludes a second action on that claim or any part of it." *Tarkanian,* 110 Nev. at 599, 879 P.2d at 1191. "Claim preclusion applies when a second suit is brought against the same party on the same claim." In re Medomak Canning, 111 B.R. 371, 373 n.1 (Bankr. D. Me. 1990). If, as in the instant case, "the prior judgment is in favor of defendant, plaintiff is 'barred' from bringing another claim based on the same cause of action." *Id.* We have further stated that "[t]he modern view is that claim preclusion embraces all grounds of recovery that were asserted in a suit, as well as those that could have been asserted, and thus has a broader reach than [issue preclusion]." *Tarkanian,* 110 Nev. at 600, 879 P.2d at 1191.

" 'The general rule of issue preclusion is that if an issue of fact or law was actually litigated and determined by a valid and final judgment, the determination is conclusive in a subsequent action between the parties.' " *Id.* at 599, 879 P.2d at 1191 (quoting Charles A. Wright, Law of Federal Courts § 100A, at 682 (4th ed. 1983)). "The doctrine provides that any issue that was *actually and necessarily litigated* in [case I] will be estopped from being relitigated in [case II]." *Id.* at 599, 879 P.2d at 1191. Unlike claim preclusion, issue preclusion "does not apply to matters which could have been litigated but were not."[5] *Pomeroy,* 517 P.2d at 399.

Adopting the language from Justice Traynor's opinion in Bernhard v. Bank of America National Trust & Savings Ass'n, 122 P.2d 892 (Cal. 1942), we have stated:

> For res judicata to apply, three pertinent elements must be present: (1) the issue decided in the prior litigation must be identical to the issue presented in the current action; (2) the initial ruling must have been on the merits and have become final; and (3) the party against whom the judgment is asserted must have been a party or in privity with a party to the prior litigation.

---

[5]To the extent our opinion in University of Nevada v. Tarkanian, 110 Nev. 581, 600, 879 P.2d 1180, 1192 (1994), suggests that a relevant inquiry is "whether the *issue* might have been properly litigated in the district court," it is hereby modified. (Emphasis added.) We note in that opinion, we went on to clarify: "For *res judicata* purposes, a judgment against several defendants settles nothing as to their relative rights and liabilities inter se, *unless their hostile and conflicting claims were actually brought in issue, litigated and determined.*" *Id.* (Emphasis added.) This is a correct statement of the law pertaining to issue preclusion and is equally applicable where there has been a judgment in favor of multiple defendants.

*Tarkanian,* 110 Nev. at 598, 879 P.2d at 1191. However, Justice Traynor's oft-cited tripartite test is somewhat misleading in that it refers only to identity of *issues,* which is relevant to the doctrine of issue preclusion, but makes no mention of the identity of *claims* relevant to a claim preclusion analysis. Accordingly, we hereafter construe this language as stating the applicable test for issue preclusion, rather than for res judicata which encompasses the rule of claim preclusion.

When dealing with subsequent litigation between former code-fendants, our rules governing cross-claims must also be considered in conjunction with the common law rules of preclusion. NRCP 13(g), modeled after Federal Rule of Civil Procedure 13 (FRCP 13), provides:

> . . . **Cross-Claim Against Co-Party.** A pleading *may* state as a cross-claim any claim by one party *against a co-party* arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein or relating to any property that is the subject matter of the original action. . . .

(Emphasis added.) The language of this rule is clearly permissive as contrasted with the compulsory language of NRCP 13(a) which provides that: "A pleading *shall* state as a counterclaim any claim which at the time of serving the pleading the pleader has *against any opposing party,* if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ." (Emphasis added.)

Although a case of first impression in Nevada, many other courts and commentators have addressed the effect of permissive cross-claim rules on the doctrines of issue and claim preclusion. As noted in one prominent treatise discussing the interaction of FRCP 13 and res judicata: "A party who decides not to bring his claim under Rule 13(g) will not be barred by res judicata, waiver, or estoppel from asserting it in a later action, as he would if the claim were a compulsory counterclaim under Rule 13(a)." 6 Charles Alan Wright, et al., Federal Practice and Procedure § 1431 (2d ed. 1990).

Likewise, the Ninth Circuit has held that "a judgment entered in a previous action in which the parties had been codefendants who had not filed any cross-claims against each other did not have any res judicata [(meaning claim preclusion)] effect because there had not been any adjudication between the parties on any cause of action." Steen v. John Hancock Mut. Life Ins. Co., 106 F.3d

904, 911 (9th Cir. 1997); *see also* Peterson v. Watt, 666 F.2d 361, 363 (9th Cir. 1982) (noting that where a party to an action has an FRCP 13(g) permissive cross-claim, the party has the option to pursue that claim in an independent action, and holding that "if such a claim is neither asserted nor litigated, the parties cannot be barred from asserting it in a later action by principles of res judicata, waiver, or estoppel").

There is conflicting jurisprudence; however, many other courts have reached conclusions similar to the Ninth Circuit. *See, e.g.,* Potomac Design, Inc. v. Eurocal Trading, Inc., 839 F. Supp. 364, 368 (D. Md. 1993) (quoting American Industrial Leasing Co. v. Law, 458 F. Supp. 764, 769 (D. Md. 1978)) ("[B]ecause cross-claims are permissive under Maryland law, 'a party who does not assert a cross-claim is *not* barred by res judicata in a subsequent action.'"); Houlihan v. Fimon, 454 N.W.2d 633, 637 (Minn. Ct. App. 1990) (concluding that plaintiff was not required to bring a cross-claim against former codefendants in prior action as it would have made her cross-claim mandatory rather than permissive); Israel v. Farmers Mut. Ins. Ass'n of Iowa, 339 N.W.2d 143, 146 (Iowa 1983) (holding that where cross-claim was permissive, claim preclusion was an invalid defense in subsequent suit against former codefendants).

Although courts have held that applying claim preclusion to subsequent litigation between former codefendants would have the effect of negating permissive cross-claim rules, some courts have recognized that issue preclusion may be raised as a viable defense. *See, e.g.,* McClellan v. Columbus I-70 West Auto-Truckstop, 525 F. Supp. 1233, 1234 (D. Ill. 1981) (noting that under Illinois law, parties need not have been on opposite sides in the prior litigation for issue preclusion to apply); Davis v. O'Brien, 326 A.2d 511, 512 (Pa. Super. Ct. 1974) (holding that for issue preclusion to apply, parties need not have been adversaries in prior action and may have been merely codefendants). However, as a practical matter, the Ninth Circuit has noted that " 'federal courts generally do not apply collateral estoppel, or issue preclusion, between parties who were codefendants in the prior action,' because the 'prior action is usually not considered the 'actual, full, and fair litigation' necessary to apply collateral estoppel,' " *Steen,* 106 F.3d at 911 (quoting Alumax Mill Prods. v. Congress Fin. Corp., 912 F.2d 996, 1012 (8th Cir. 1990)).

Considering Executive's claims against former codefendants Palmall/Shipkey and Ticor, we adopt the reasoning of the Ninth Circuit and conclude that these respondents may not rely on claim preclusion as an affirmative defense. Any claims Executive might have had against these respondents during the pendency of case I

were permissive pursuant to the express language of NRCP 13(g). We will not allow the doctrine of claim preclusion to convert the permissive character of NRCP 13(g) into a compulsory mandate.

However, we further conclude that issue preclusion is an available defense where Justice Traynor's three-part test, quoted *supra,* has been satisfied. The ruling in case I was final and on the merits, and the same parties involved in case I are involved in case II. Thus, the only question is whether the issues raised by Executive in case II are *identical* to those which were actually and necessarily decided in case I. *See Tarkanian,* 110 Nev. at 598, 879 P.2d at 1191. We conclude that they are not.

Executive's case II complaint charges Palmall/Shipkey with negligence, gross negligence, and negligent misrepresentation, breach of fiduciary duty and constructive fraud, and breach of implied and express contracts. The same claims are made against Ticor, with additional claims of misrepresentation and fraudulent concealment, bad faith and breach of the duty of good faith and fair dealing, statutory unfair practices, and escrow and title insurance malpractice.

Executive asserts that Palmall/Shipkey and Ticor "negligently prepared, executed, delivered and recorded" the Markses' January 17, 1986 deed. This deed erroneously included a legal description of lot 2, which Palmall/Shipkey had previously quit-claimed to Executive on January 13, 1986, but which was not recorded until January 28, 1986. Executive claims that but for Palmall/Shipkey's negligent delay in filing the parcel map subdividing the property into lots 1 and 2, and the delay in recording Executive's quitclaim deed, Executive would not have been damaged by the cloud upon its title to lot 2. Executive further asserts that Ticor "negligently failed to warn Executive Management of a potential conflict of interest that existed in Ticor's defending both its interests and [Executive's]."

Executive's complaint also charges that both Palmall/Shipkey and Ticor had a fiduciary duty "to deal with [Executive] with the utmost honesty and good faith." Ticor allegedly breached this duty by concealing facts from Executive, providing shared counsel in case I notwithstanding conflicts between the interests of Executive and Ticor, failing to communicate with Executive during the litigation of case I, and entering into case I stipulations with parties adverse to Executive, namely, the party attempting to foreclose on Executive's lots 2 and 3.[6]

---

[6]According to Executive, it had no knowledge of Ticor's alleged negligence in searching the title records and attaching an erroneous legal description to the Markses' deed, nor did it know of Ticor's re-recording of the Markses' deed in February 1986 until trial commenced in case I. Executive also maintains that it was not until Shipkey testified during case I that it gained knowledge of Shipkey's alleged agreement with the Marks to delay delivery of

With regard to Palmall/Shipkey, the case II complaint alleges that they had a fiduciary duty not to jeopardize the sale of lot 2 to Executive by their transactions with the Markses. Executive claims that ''through a course of dealing which involved two sales, representations of easement rights and parcelling[,]'' Palmall/Shipkey engaged in constructive fraud.

Additionally in its case II complaint, Executive maintains that Palmall/Shipkey breached an implied and express sale contract to convey full legal title to lots 2 and 3 to Executive, in that they failed to timely record the parcelization map and Executive's quit-claim deed. Ticor allegedly breached its implied and express contract to ''carry out the escrow and convey marketable title . . . in a professional, competent manner.'' By failing to immediately inform Executive of the cloud on its title to lot 2, to ''adequately disclose potential conflicts resulting from a joint defense,'' and to provide Executive with independent counsel, Executive maintains that this contract was breached.

Executive's complaint further asserts that Ticor's allegedly negligent and improper conduct during its representation of Executive gave rise to claims of negligent misrepresentation and fraudulent concealment. Specifically, Executive charges that Ticor failed to apprise Executive of pertinent information during the pendency of case I, including potential counterclaims against the Markses and conflicts of interest between Ticor and Executive. Executive maintains that Ticor wilfully misled and fraudulently concealed evidence of its negligence from Executive during the case I proceedings. Moreover, Executive asserts that Ticor improperly refused to protect lot 3 from the cloud of title over lot 2; although Ticor sought an injunction against foreclosure of lot 2, because the insurance contract also covered lot 3 and Ticor did not seek an injunction against foreclosure on lot 3 or ''attempt to expunge or bond around the recorded *Lis Pendens*[,]'' Ticor allegedly failed to protect Executive's interests. Executive's complaint contends that these and other alleged derelictions set forth in the previous claims also gave rise to claims of bad faith and breach of the duty of good faith and fair dealing, statutory unfair practices, and escrow and title malpractice.

We conclude that none of these intensely factual issues was actually and necessarily litigated during the course of the Markses' case against Executive, Ticor, and Palmall/Shipkey. The fact that Palmall/Shipkey intended to sell lots 2 and 3 to Executive and lot 1 to the Markses does not satisfy the identity of issues requirement necessary to successfully preclude litigation of the instant case under the rule of issue preclusion. Although the dis-

---

Executive's deed so as to facilitate the Markses' attempt to obtain zoning for their proposed shopping center.

trict court found in case I that the Markses had not shown Palmall/Shipkey had breached their contract *with the Markses,* this finding does not negate the viability of Executive's subsequent complaint. We also note that in case I, the court expressly found that the Markses had failed to make a showing of damages which, of course, was fatal to many of their claims. It has yet to be determined if, and to what extent, Executive has been damaged by the respondents' alleged conduct.

Likewise, the district court's findings in case I pertaining to the Markses' claims against Ticor have no preclusive effect on the instant matter. The court addressed only *the Markses'* rights under *their* contract with Ticor, and expressly found that *"Ticor may have been negligent"* but, again, the Markses suffered no damages and failed to present necessary expert testimony on other possible negligence claims. Although the district court found that Ticor did not conspire with Palmall/Shipkey or anyone else to record fraudulent deeds, we note that the only conspiracy alleged by Executive was between Palmall/Shipkey and the Markses. Furthermore, the findings in case I that Ticor did not commit unfair trade practices, nor did it act in bad faith in the performance of any contractual or fiduciary duties owed to the Markses, do not address these issues as they pertain to Executive and its relationship with Ticor. Therefore, we conclude that none of Executive's claims against Ticor[7] or Palmall/Shipkey was properly barred under the doctrine of issue preclusion.[8] We reverse the dis-

[7]Moreover, the February 22, 1991 correspondence memorializing a conversation between Executive and Ticor indicates that the parties expressly agreed that Executive's claims against Ticor had been preserved. As noted by one learned commentator, an agreement of the parties in a prior suit may negate the preclusive effect of any judgment in that suit. Allan D. Vestal, *Res Judicata/Preclusion* 402-03 (1969). Professor Vestal further explains:

> Waiver of the preclusive effect of the first judgment may also be found in the conduct of a party in Suit I. What the courts are really saying is that the litigant so acted in the first suit that it would be inequitable to allow him to rely on the first judgment as preclusive.

*Id.* at 547.

[8]We reject Ticor's argument that because it made no reservation of rights in its defense of Executive, Ticor and Executive's shared case I counsel could have no conflict of interest. As an initial matter, Ticor's defense of Executive without reservation of rights does not, of itself, render impossible a conflict of interest arising out of joint representation. Whether there was indeed a conflict of interest arising out of the joint representation of Ticor and Executive, and whether such joint representation was the cause of any damages (however remote the possibility of damages may be under these circumstances) should be resolved at trial.

Secondly, Ticor raises the reservation of rights issue in an attempt to rebut Executive's assertion that res judicata should not apply because it had no knowledge of certain claims against Ticor until the case I trial due to the alleged conflict of interest. Because we hold that res judicata does not preclude litigation of the instant case, Ticor's argument is not relevant.

trict court's dismissal of Executive's claims against Ticor and remand this case for further proceedings on all of the causes of action set forth against Ticor in the case II complaint.

As an alternative argument, Palmall/Shipkey assert that Executive's cause of action for breach of fiduciary duty and constructive fraud cannot lie as a matter of law. In Long v. Towne, 98 Nev. 11, 13, 639 P.2d 528, 529-30 (1982), we explained that: "Constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or to violate confidence." Constructive fraud may arise when there has been "a breach of duty arising out of a fiduciary or confidential relationship." *Id.* at 13, 639 P.2d at 530. Such a relationship exists where "one reposes a special confidence in another so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence." *Id.* In *Long,* we noted that "[g]enerally, no fiduciary obligations exist between a buyer and seller of property" and concluded, on the facts at issue in that case, that the buyer had "reposed no special confidence" in the seller. *Id.; see also* Mullen v. Cogdell, 643 N.E.2d 390, 401 (Ind. Ct. App. 1994) (recognizing that a fiduciary relationship does not exist between a buyer and seller in an arms length transaction). "In fact, [the buyer] stated that she did not trust [the seller]." *Long,* 98 Nev. at 13, 639 P.2d at 530. Furthermore, in *Long* we concluded that the seller had not "misrepresented or concealed any material fact." *Id.* at 13, 639 P.2d at 530.

In its reply brief, Executive seems to concede the point that there is no fiduciary relationship between a buyer and seller of real property, but maintains that the absence of such a relationship is not fatal to its cause of action for constructive fraud. We agree and conclude that although Executive's breach of fiduciary duty claim will not lie against Palmall/Shipkey, there are factual questions concerning the issue of "special confidence" yet to be resolved, and thus a claim for constructive fraud may be viable. *See Mullen,* 643 N.E.2d at 401 (holding that existence of a fiduciary relationship is not the only basis for a claim of constructive fraud and that such a claim may arise between buyers and sellers). Accordingly, we affirm that portion of the district court's judgment dismissing Executive's breach of fiduciary duty claim against Palmall/Shipkey, but we reverse the dismissal of all remaining claims against Palmall/Shipkey and remand this case for further proceedings thereon. We must next consider Executive's claims against the Markses.

Related to the common law doctrines of issue and claim preclu-

sion is the law of compulsory counterclaims, labeled by one commentator as "preclusion by rule." Allan D. Vestal, *Res Judicata/Preclusion* 158 (1969). Nevada's civil procedure rule on compulsory counterclaims mirrors the language of its federal counterpart, FRCP 13(a). NRCP 13(a) provides in pertinent part:

> **Compulsory Counterclaims.** A pleading *shall* state as a counterclaim any claim which at the time of serving the pleading the pleader has against any *opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . .*

(Emphasis added.)

Pursuant to NRCP 13(a), we conclude that the majority of Executive's causes of action against the Markses were compulsory. In case II, Executive's third amended complaint sought recovery from the Markses for negligence, gross negligence, negligent misrepresentation, intentional interference with contractual relations, slander of title, and abuse of process. Executive asserts that the Markses were negligent or grossly negligent in filing a quiet title action against Executive in case I because, according to Executive, the Markses knew or should have known that they did not own lot 2.

"Slander of title involves false and malicious communications, disparaging to one's title in land, and causing special damage." Higgins v. Higgins, 103 Nev. 443, 445, 744 P.2d 530, 531 (1987) (citations omitted). Executive asserts that the Markses intentionally or negligently represented to others that they owned lot 2 and filed the *lis pendens* even though they knew that they did not own lot 2. Executive claims that as a result of the *lis pendens* it could not sell the property, was unable to make payments on the property, and thereby lost the property through foreclosure. Executive asserts that the Markses intentionally interfered with its contract with Palmall. According to Executive's complaint, the Markses were aware of the fact that the Executive/Palmall deal encompassed both lots 2 and 3 and attempted to "wrongfully take" lot 2 "through a frivolous lawsuit." Executive alleges that the Markses further interfered with later sales to third parties by placing the *lis pendens* on lots 2 and 3 "thereby causing land sale contracts to fail."

We conclude that all of Executive's claims, with the exception of that for abuse of process, were compulsory counterclaims. "The purpose of NRCP 13(a) is to make an 'actor' of the defendant so that circuity of action is discouraged and the speedy settlement of all controversies between the parties can be accomplished in one action." Great W. Land & Cattle v. District

Ct., 86 Nev. 282, 285, 467 P.2d 1019, 1021 (1970). We conclude that Executive should have attempted to resolve its various negligence, slander of title, and tortious contractual interference claims against the Markses in case I. These claims arose out of the same transaction or occurrence litigated in case I—namely, who owned lot 2. Because the Markses filed the *lis pendens* on Executive's property as part of their quiet title suit and this filing is part of the basis of Executive's case II claims against the Markses, we conclude that NRCP 13(a) applied. *See generally* MacDonald v. Krause, 77 Nev. 312, 362 P.2d 724 (1961) (discussing the breadth of the phrase "same transaction or occurrence"). Therefore, the district court did not err in dismissing these claims against the Markses.

Executive alleges abuse of process in that the Markses filed suit in an attempt to wrongfully take away its title to lot 2; the complaint further asserts that this alleged abuse of process "led to the *Lis Pendens* which effectively prevented [Executive] from selling its property" for millions of dollars. We conclude that this claim was not compulsory and, therefore, is not barred by the rule of claim preclusion. *See* Yaklevich v. Kemp, Schaeffer, 626 N.E.2d 115, 119 (Ohio 1994) (holding under a civil procedure rule similar to NRCP 13(a), that "abuse of process is not a compulsory counterclaim which must be brought in the underlying litigation"); 6 Charles A. Wright et al., Federal Practice & Procedure § 1410 (2d ed. 1990) (stating that claim preclusion "never" bars a party from suing independently on a permissive counterclaim).

The fundamental elements of this tort consist of (1) an ulterior purpose, and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding. Dutt v. Kremp, 111 Nev. 567, 575, 894 P.2d 354, 357 (1995). These issues were not actually and necessarily litigated during the pendency of case I; therefore, the rule of issue preclusion is not implicated. Moreover, we are not persuaded by the Markses' argument that because they were awarded an easement in case I and, at one point, the case I district court found that Mrs. Marks believed she would receive lot 2, there can be no showing of the requisite ulterior motive necessary for an abuse of process claim. These questions must be resolved by the fact-finder and, therefore, summary judgment is not appropriate. Accordingly, we conclude that the district court erred in dismissing Executive's abuse of process claim against the Markses. We reverse this part of the judgment and remand for further proceedings on this claim.

Turning to Executive's final contention: As quoted in the factual recitation, in granting the motion to dismiss against Executive, Judge Mosley stated, "I spoke to Judge Thompson and his recollection of this was that there was a full hearing of the issues or an opportunity given to fully hear the issues, and the parties he said elected to go forward." Executive asserts that Judge Mosley violated Canon 3(B)(7) of the Nevada Code of Judicial Conduct[9] by basing his decision on an ex parte conversation with Judge Thompson. Because of this alleged violation, Executive maintains that the case must be remanded and randomly assigned to a different judge.

Although the case will be remanded, in part, on the basis of the substantive law set forth above, we do not agree that assignment to a different judge is necessary.[10] Canon 3(B)(7)(c) clearly permits a judge to consult with another judge. Notwithstanding Executive's assertion that Judge Mosley had this conversation with Judge Thompson after Thompson had left the bench to become an assistant district attorney, it does not appear that Judge Mosley violated any of the judicial canons.

Furthermore, having reviewed the entire transcript from which the above quoted statement was taken, we conclude that Judge Mosley did not rely on his conversation with Judge Thompson in deciding to dismiss Executive's case pursuant to the doctrine of res judicata; Judge Mosley heard testimony from all parties on the issue and reviewed the transcript of case I. Judge Mosley's independent review of the pleadings, affidavits, and testimony could have formed the basis of his decision to dismiss Executive's case pursuant to the doctrine of res judicata. Therefore, we conclude that there was no prejudice to Executive warranting reassignment to a different district court judge. Thus, even if it was error for Judge Mosley to discuss the matter with Judge Thompson, such error was harmless.

---

[9] Canon 3(B)(7) provides in part:

> A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:
>
> . . . .
>
> (c) *A judge may consult with . . . other judges.*

(Emphasis added.)

[10] We note that the Code of Judicial Conduct does not provide such a remedy for violation of Canon 3(B), and we do not believe that disqualification is required under Canon 3(E).

## CONCLUSION

We conclude that Executive's claims against the Markses, with the exception of the abuse of process claim, were compulsory counterclaims; therefore, the district court did not err in dismissing those claims in a subsequent suit. However, we reverse that portion of the district court's judgment with respect to Executive's abuse of process claim and remand this case for further proceedings on that claim against the Markses.

We conclude that Executive's claims against Ticor and Palmall/Shipkey were not barred by the doctrine of res judicata pursuant to the rule of claim preclusion because any claims against these former codefendants were permissive in nature. Furthermore, the issues raised by Executive in case II were not identical to those raised in case I, nor were they actually and necessarily litigated therein. Therefore, the rule of issue preclusion does not bar Executive's present complaint against Ticor and Palmall/Shipkey. However, because there is generally not a fiduciary relationship between a buyer and seller of real property, Executive's claim against Palmall/Shipkey for breach of fiduci-ary duty will not lie and was properly dismissed by the district court. Therefore, with the exception of Executive's fiduciary duty claim against Palmall/Shipkey, we reverse that portion of the judgment dismissing all other claims against Palmall/Shipkey and all claims against Ticor, and remand for further proceedings.

Because we conclude that the district court did not err in consulting with Judge Thompson and, if it did, such error was harmless, there is no need to assign a different district court judge on remand of this matter.[11]

[11]THE HONORABLE CLIFF YOUNG, Justice, did not participate in the decision of this matter.